**Sara Anne DAINES, Plaintiff,**

v.

**CITY OF MANKATO, Defendant.**

**Civ. No. 3–87–789.**

United States District Court,
D. Minnesota,
Third Division.

Sept. 7, 1990.

**684**

Paul Sprenger, Sprenger & Lang, Minneapolis, Minn., for plaintiff.

C. Ann Olson, Dorsey & Whitney, Minneapolis, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER FOR JUDGMENT AND MEMORANDUM

RENNER, District Judge.

### FINDINGS OF FACT

1. Sara Anne Daines, the plaintiff, worked at the City of Mankato from June 9, 1980, to July 16, 1984. She voluntarily resigned on July 1, 1985, after taking a one-year educational leave of absence.

2. The City of Mankato ("City"), the defendant, is an incorporated political subdivision of the State of Minnesota and has its principal address at 202 East Jackson Street, Mankato, Minnesota.

3. This matter came before the Court for trial on January 22, 1990, on Daines' claims of sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), and the Minnesota Human Rights Act, Minn.Stat. § 363.01, et seq. ("MHRA"). The claims tried to the Court included Daines' allegations of sex discrimination based on the City's failure to appoint her Housing Director in May or September 1984, and her allegations of retaliation subsequent to her filing a sex discrimination charge in June 1984.

4. On June 6, 1984, Daines filed a charge of sex discrimination and on July 3, 1984, a charge of retaliation with the Minnesota Department of Human Rights. She also filed both charges with the Equal Employment Opportunity Commission ("EEOC").

5. On August 1, 1986, the Minnesota Department of Human Rights found probable cause that the City had discriminated against Daines in not selecting her as the Housing Director on May 21, 1984 and had retaliated against her for filing her initial charge on June 6, 1984.

6. After being issued right-to-sue letters, Daines commenced this suit on November 18, 1987.

7. The City Council for the City of Mankato is responsible under the City Charter for setting policy for the City and for hiring the City Manager.

8. The City Manager as chief executive officer is responsible for the day-to-day administration of City affairs and City budget preparation. The City Manager has the ultimate authority on behalf of the City to hire, promote, transfer and make other employment decisions concerning City employees.

9. The Assistant City Manager aids the City Manager in the performance of his or her duties, fills in for the City Manager in the absence of the City Manager, and acts as the department head of the Community Development Department.

10. The City is organized into five departments: Public Safety (police and fire), Public Works, Administration and Finance, Community Development, and Legal.

11. The principal divisions of the City's Community Development Department are the Housing Division, Planning Division and Economic Development Division.

12. Employment positions with the City of Mankato are categorized into different grade levels. The positions at issue in this matter are those at grades 17 and above.

13. William Bassett is the City Manager and has held that position since 1968.

14. Thomas Melena was the Assistant City Manager and head of the Community Development Department from 1981 to 1985.

15. During the period from 1981 to 1985, hiring and transfer decisions in the Community Development Department were made by Thomas Melena with the approval of William Bassett.

16. Dale Darrow worked for the City from 1972 through August 1984, and headed the Housing Department from 1976 until May 1984 when he was appointed Economic Development Director.

17. In the early 1980's, the Housing Division consisted of Dale Darrow, Housing Director, two housing assistants (one responsible for Section Eight housing and one responsible for public housing), and interns and clerical staff shared by both the Planning and Housing Divisions.

18. Section Eight housing is a program through which low-income persons receive rent assistance in renting from approved private landlords.

19. Public housing is government-owned housing that is made available to qualified low-income tenants.

20. The Board of Directors of the City Housing and Redevelopment Authority ("HRA") and County HRA set policies for the HUD-financed programs at the local level.

21. The City of Mankato has service contracts with both the Mankato HRA and the County HRA to provide staff and services to the HRA boards in order to operate the housing programs.

22. The City Housing Director and the Housing Division staff are primarily responsible on behalf of the City for providing the services under the City's contract with the HRAs.

23. The HRAs are dependent upon federal funding for their existence.

24. HUD provides supervision of the HRAs for compliance with the HRA funding contracts.

25. During 1983 and through May of 1984, Housing Director Dale Darrow served as the Executive Director for the County HRA, and Thomas Melena was the Executive Director for the Mankato HRA.

26. Sara Daines began an internship with the City on January 6, 1980 through Mankato State University where she was an undergraduate student. Her internship was under the supervision of Dale Darrow.

27. On May 19, 1980, Daines applied for the position of Housing Assistant I. She was appointed a technical specialist in the Housing Department on June 9, 1980, and then promoted to Housing Assistant I, Range 14, after she received her bachelor's degree in August 1980.

28. On December 22, 1980, Daines was appointed Housing Assistant II, Range 17. While holding that position, Daines received periodic salary increases within her salary range.

29. While employed in the Housing Division, Daines worked first with the day-to-day implementation of the Section Eight program and then with the public housing program.

30. On December 16, 1983, Daines applied for the position of Assistant Planner with the Planning Division. On February 6, 1984, she was appointed Assistant Planner at Range 17, Step C.

31. Prior to switching to the Planning Division in 1984 and during the time that Daines worked as a Housing Assistant, Daines began to consider pursuing a master's degree which was encouraged by the City.

32. The City facilitates its employees' educational efforts by providing tuition reimbursement for City employees who take courses at Mankato State University.

33. Daines had applied to graduate degree programs at several universities in 1982 and 1983. In late 1983, Daines applied to the University of Chicago's program in the field of Urban and Regional Geography.

34. During part of the time that Daines worked in the Housing Division, Mary Barrett also was a housing assistant.

35. There are nine EEOC job categories. The category "officials and administrators" is the highest and includes City management jobs such as department and division heads, the latter being at issue in this case.

36. From January 1, 1975 until June 6, 1984, when Daines filed her first charge of sex discrimination, the City had appointed 22 men and no women to the EEOC officials and administrators job category.

37. Although required by its affirmative action program, in place since 1974, the City did not keep applicant flow data for officials and administrators positions during the period from January 1, 1975 through June 6, 1984.

38. The availability of qualified women for Officials and Administrators positions at the City during the period from January 1, 1975 to June 6, 1984, based on standard and accepted statistical sources for employment data, ranges from 28.36% female to 33.62% female.

39. In the City's affirmative Action Plan dated September 1988, the City of Mankato states that the availability of qualified women for officials and administrators jobs is 32.4%. This availability figure was based on official state and federal census records maintained at the State of Minnesota Department of Jobs and Training, Research and Statistics Office, reflecting detailed occupational availabilities as of 1980 within the Blue Earth and Nicollet counties in Minnesota.

40. The percentage of female/male applicants for the 1984 and 1989 Housing Director searches at Mankato are as follows:

| Female Availability | Total Applicants/Search Year |
| --- | --- |
| 33% female availability | 21 applicants/1984 |
| 28% female availability | 29 applicants/1989 |
| 30% female availability | 50 applicants/combined 1984 and 1989 |

41. The City's applicant flow data from certain positions filled in 1988 and 1989 at grades 17 and above shows availabilities of women from 6% to 20% excluding the 1989 housing director position which had an availability of 28%.

42. Given the availability of qualified women for officials and administrators positions at the City of Mankato from January 1, 1975 to June 6, 1984, it is reasonable to expect appointments of 6 to 8 women to those positions.

43. The City's failure to appoint any women from January 1, 1975 to June 6, 1984, to the 22 officials and administrators positions filled by men is measured by statistical experts in standard deviations. Specifically, the deviation of actual (no women) from that which is expected in a bias free appointment process (6–8 women) is measured, depending on the availability referenced, at from 2.71 standard deviations to 3.11 standard deviations.

44. For various job categories, the breakdown of the female availabilities, comparisons of expected versus actual appointments, and measurement of the differences of actual from expected appointments of women in the 22 officials and administrators positions from January 1, 1975 to June 6, 1984 are as follows:

Expected Versus Actual Number of Female Appointments
to Official and Administrator Vacancies

January 1, 1975 through June 6, 1984

22 total appointments (0 female, 22 male)

| Female Availability | Female Appointments | | Actual is the Following Number of Standard Deviations from Expected |
| --- | --- | --- | --- |
| | Expected | Actual | |
| United States, All Executives 30.53% female | 6.72 | 0 | 2.88 |
| United States, Admin. & Officials, Public Admin. 33.62% female | 7.40 | 0 | 3.11 |
| United States, Admin. & Officials, Public Admin. plus Admin., Protec. Ser. 31.65% female | 6.96 | 0 | 2.96 |
| Minnesota, All Executives 28.36% female | 6.24 | 0 | 2.71 |
| Minnesota, Administrator, Public. 32.45% female | 7.14 | 0 | 3.02 |
| Minnesota, Admin., Public. plus Admin., Protec. Serv. 29.92% female | 6.58 | 0 | 2.83 |
| Blue Earth and Nicollet Counties, All Executives. 28.94% female | 6.37 | 0 | 2.76 |
| Blue Earth and Nicollet Counties, Administrators, Public. 29.82% female | 6.56 | 0 | 2.82 |
| Blue Earth and Nicollet Counties, Admin., Public. plus Admin., Prot. Serv. 31.67% female | 6.97 | 0 | 2.97 |

45. Standard deviations of between 2.71 and 3.11 for the appointment process at the City for officials and administrators from January 1, 1975 to June 6, 1984 show a statistically significant adverse impact on available and qualified women candidates as a class.

46. The chances that no women and 22 men would be appointed to fill the 22 Officials and Administrators vacancies at the City of Mankato from January 1, 1975 to June 6, 1984, without a bias against women can be stated in lay terms as from 3 to 7 chances out of 1,000. That is, 3.11 standard deviations equate to about 3 chances out of 1,000 and 2.71 standard deviations equate to about 7 chances out of 1,000.

47. Daines was an available and qualified woman candidate for one or more of the City's vacancies in the Officials and Administrators job category between January 1, 1975 and June 6, 1984.

48. The City Employee Relationship Policy required posting of notice to City employees of all job openings for a minimum of 5 days on internal City bulletin boards. The purpose of this policy was to allow qualified internal applicants an opportunity to apply for job openings.

49. Prior to June 6, 1984, when Daines filed her charge of discrimination, the City of Mankato did not uniformly follow the policy of posting job openings as articulated in the Employee Relationship Policy.

50. The Mankato Affirmative Action Program in effect from 1974 to 1988 re-

quired the City, among other things, to analyze recruitment and selection processes to assure that artificial barriers to the hiring and promoting of women do not exist; to establish annual goals to remedy underutilization of women through such mechanisms as recruitment of qualified woman applicants and creation of trainee positions and career ladders to advance qualified internal applicants; and to document all applicants rejected for position openings.

51. The City of Mankato did not consistently follow its Affirmative Action Program requirements.

52. Of the 22 officials and administrators positions filled by the City between January 1, 1975 and June 6, 1984, 10 of the positions were posted, 5 were advertised and 11 (possibly 12) were neither posted nor advertised. (Advertised means that a vacancy notice for the position was placed in a newspaper or other external periodical of local, state-wide, or national circulation.)

53. Bassett, the City Manager, has the authority under City charter to appoint whomever he deems qualified to any position without posting or advertising and without regard to objective qualifications.

54. With regard to officials and administrators positions filled between January 1, 1975 and June 6, 1984, Bassett only exercised this authority to appoint men.

55. City officials admitted that the following men were appointed to officials and administrators positions from January 1, 1980 through 1984, without posting, advertising or any kind of competitive process: Thomas Melena (Industrial Development Director); Thomas Melena (Assistant City Manager and Head of the Community Development Department); Doug Elling (Parks & Forestry Superintendent); Gary Oehlers (Data Processing Manager); George Rosati (Utilities Superintendent); Jim Harberts (Planning Director); Dale Brower (Parking Supervisor); Dale Darrow (Economic Development Director and Acting Economic Development Director); Larry Forsythe (Housing Director and Acting Housing Director.)

56. During her first year as a Housing Assistant, Daines administered the Section 8 Housing program. In that program, she made eligibility determinations and oversaw payment of subsidies to private landlords on behalf of low income tenants.

57. In approximately the summer of 1981, Daines became the administrator of Mankato's Public Housing Program. In that position, she managed public housing owned by the City. While administering these programs, she exercised discretion, trained and supervised other personnel and worked closely with the tenants, contractors, HRA boards and HUD.

58. When Daines had the position of Housing Assistant I, from 1980–1981, she spent 25% of her time on non-technical, administrative tasks. As a Housing Assistant II, from 1982–1984, Daines spent 50% of her time on non-technical, administrative tasks.

59. Contracts between the City and the HRAs require the City to provide a Housing Director who complies with the job description for Housing Director appended to the contract. The job description in the contract contains three specific objective job requirements: (1) three years of responsible experience in housing management, (2) a bachelors degree, (3) and a Public Housing Manager's Certificate. The contracts also require the City to provide other personnel services such as financial and accounting services, which the City does through its Finance Department. The HRAs pay the City for its housing, finance and other personnel services under the contracts.

60. In January 1984, Daines applied and interviewed for a position as Assistant Planner in the Planning Division. She sought the position to advance her career within the City.

61. City Officials admitted that the following men were appointed to Assistant Planner positions without posting or advertising or any kind of competitive process: Larry Forsythe, Mark Liefermann, Ryan Schroeder, Kirk MacDonald. The only two women, one of whom was Daines, who were appointed to the job of Assistant

Planner during the same time period had to apply for the position and compete with other applicants.

62. When Daines inquired about the Assistant Planner opening in an initial interview with Planning Director, James Harberts, Harberts asked Daines if she was married. He commented that his previous female planner got married and moved away with her husband and he did not want that to happen again.

63. Daines was interviewed for the Assistant Planner position by Harberts, Ben Mercer, the Personnel Director, and Tom Melena, the Assistant City Manager. The interview lasted 30 to 45 minutes. About 20 minutes into the interview, Melena said that his one concern was whether or not Daines could be "one of the boys". The three men spent the last ten minutes of the interview giving examples of being "one of the boys", including stringing toilet paper in another man's office.

64. In May of 1984, Melena and Bassett decided to appoint Darrow to the position of Economic Development Director and appoint an Associate Planner, Larry Forsythe, to Darrow's Housing Director position. Both positions were Division Head jobs in the officials and administrators job category.

65. Melena wrote a memo dated May 3, 1984, to Bassett concerning the appointments, which were to be made without posting or advertising. In the memo, Melena stated that the appointment of an Economic Development Director was needed by the City and that Darrow was qualified because he was knowledgeable and enthusiastic about development work. In the same memo, Melena justified the appointment of Forsythe as Housing Director because it would give him "hands on experience in supervising," "expand his career opportunities," and make "growth opportunities available to him." There was no mention of the objective job requirements of the Housing Director position.

66. On May 14, 1984, the Mankato City Council voted to approve the budgetary changes necessary to fund the appointments which became effective May 21, 1984. It was stated that Darrow and Forsythe would fill the positions.

67. To comply with the City's employment policies, Forsythe and Darrow should have possessed the objective job requirements for the respective positions to which they were appointed.

68. At the time of Forsythe's appointment as Housing Director, Daines was more qualified. She possessed the three objective qualifications in the position description in effect at the time Forsythe was appointed: a bachelors degree, three years of responsible experience in housing management, and certification as a Public Housing Manager. (Certification is obtained after successful completion of training and testing administered by one of five or more HUD designated certifying agencies. Certification is a requirement for full HUD funding of Housing Director salaries.)

69. No other internal candidate, including Forsythe, met all three of the objective criteria.

70. Prior to the announcement that Forsythe would be appointed to the position of Housing Director, Darrow was not asked for recommendations of persons to fill the position or about the qualifications of Daines or Barrett for the position.

71. Darrow, who had supervised Daines for three years in the Housing Division, considered her the most qualified person for the Housing Director position. He testified that, in addition to meeting the three objective qualifications in the position description, Daines knew about state and federal housing loan and grant and public housing programs; she also had the ability to motivate and direct subordinates and to speak and write clearly and concisely. She established and maintained effective working relationships. Darrow considered Daines to have good judgment and attitude and her reporting to be timely and accurate.

72. Darrow considered Mary Barrett, who had also worked under his supervision, to be less qualified than Daines for the position of Housing Director. Since Bar-

rett had only worked in the Housing Division since September, 1981, she did not meet the objective requirement of three years responsible housing management experience. In addition, her housing experience was limited because she had administered only the Section 8 program. Daines, on the other hand, had administered both the Section 8 and the more demanding Public Housing programs.

73. Darrow considered Forsythe to be less qualified than Daines because he had no experience in housing management.

74. The City attempted to discredit Darrow's testimony regarding Daines' qualifications through testimony from Melena and Bassett that HUD had complained about Darrow's administration of the Housing Division. The testimony of HUD management specialists indicates that Darrow was competent and that many of the problems with HUD were due to circumstances over which Darrow had no control.

75. Forsythe did not meet two of the three objective qualifications for the Housing Director position. He had no experience in the Housing Division or in housing management and was not certified as a Public Housing Manager.

76. The reasons proffered by the City for not appointing Daines as its Housing Director in May and June of 1984 are pretextual in nature.

77. The City contended that Forsythe had more supervisory experience than Daines. However, in his May 3, 1984 memo to Bassett, Melena recommended Forsythe for the Housing Director position because the job would give Forsythe "hands on experience in supervising."

78. The City contended that its problems with HUD required selection of a Housing Director who was not a part of the Darrow administration of the Housing Department. This concern was not cited in any explanations given by the City to the Minnesota Human Rights Department. No evidence was presented supporting a conclusion that Daines was responsible for any problems that may have existed.

79. Melena testified that prior to his recommendation of Forsythe for the Housing Director position, he had considered Daines. He determined that she was not qualified because her skills and experience did not best meet the immediate needs of the job as perceived by him. However, he had very little contact with Daines and thus had little basis for assessing her qualifications.

80. Melena's selection of Forsythe was based on subjective criteria rather than on the objective qualifications stated in the job description in effect at the time and on a closed process that peremptorily eliminated the woman most qualified for the position.

81. The City's contention is pretextual that it would have selected Mary Barrett if it had to choose among the qualified women in the Housing Division to fill the position in May 1984. Darrow evaluated Daines as more qualified. Barrett had less than three years responsible housing management experience and no experience managing public housing.

82. Melena called a meeting in early May 1984 to inform Darrow and Forsythe of their appointments to the Economic Development Director and Housing Director positions respectively. At the meeting, Forsythe said he wanted the Economic Development Director job, not Housing Director. He also said he was concerned about how the women who had worked in the Housing Division, such as Daines, would react to his appointment. Melena told him the Housing Director job would increase his career opportunities and he would get a raise. Melena told him not to worry about the women in the division because he and Bassett could appoint whomever they wanted.

83. At the same meeting and at the May 14, 1984 Council meeting, Bassett, based on Melena's recommendation, stated that the City would eliminate the Assistant Planner position—Daines' position in May 1984—in order to fund the Economic Development Director position.

84. The appointment of Forsythe to the position of Housing Director constituted discrimination against Daines.

85. After the Forsythe appointment, but before the City received Daines' charge of discrimination, she had received permission for a one year educational leave of absence to pursue a graduate degree.

86. On June 14, 1984, after receiving notice of Daines' charge of discrimination, Melena called Darrow into his office and handed him the charge. Darrow testified that Melena was visibly angry and shaking. Referring to the charge, Melena stated "this will probably cost her her leave."

87. Melena met with Daines three times on the day he received her charge. Initially he went to her office, told her he had received her charge and that her educational leave was cancelled. Forty-five minutes later he called her to his office. When she got there, he was in a meeting with Harberts and Mercer. Daines stood in the doorway while Melena again told her that her educational leave was cancelled. In the afternoon, Melena called a meeting with Forsythe, Darrow, Harberts and Daines.

88. At the afternoon meeting, Melena said all personnel decisions were on hold including Daines' educational leave. He told Darrow and Forsythe that because of Daines' charge, the City was making both their appointments temporary and reopening the positions. Melena assured Darrow and Forsythe that if they were not permanently appointed to the Economic Development Director and the Housing Director positions, they would get their old jobs back.

89. Daines reminded Melena at the meeting that she had been promised in writing an associate planner position when she returned from her educational leave. Melena responded, "you can't have it both ways."

90. On or about this same date, Heather Weddle, a temporary secretary, overheard Melena say to someone in his office in an elevated voice: "If she makes this charge, she can't expect her job when she comes back."

91. Melena prepared a memorandum to Daines implying that she should not have filed her charge of discrimination and telling her that Forsythe was more qualified than she was. The memorandum also stated that if she persisted in her charge she could not expect to have her job at the end of her educational leave. Melena dictated this memorandum and gave it to Weddle to type. Weddle typed the memorandum and gave it to Melena. She later overheard Bassett telling Melena to destroy all copies of the memorandum. When she later tried to find the memorandum on Melena's computer disk, it had been erased.

92. Melena admitted that but for Daines' charge, the City would have appointed an internal candidate.

93. After June 14, 1984, when the City received notice of Daines' first discrimination charge based on Forsythe's appointment as Housing Director, the City's personnel director, Mercer, drafted a job posting for the Housing Director position which changed the job requirements to state that a masters degree was preferred, and that housing experience was not required. While the earlier job description required "three years of responsible experience in housing management," the June 1984 posting listed "3–5 years supervisory experience in housing or a related field." As to the public housing certificate which had previously been required, the 1984 job posting stated "Certification required or the ability to be certified within 1 year."

94. The City's contract with the HRAs requires that the Housing Director have the minimum job requirements.

95. The changes in the job description requirements made Forsythe, among others, eligible for the job. The changes made Daines a less competitive candidate for the Housing Director job. The change in job requirements significantly expanded the candidate pool for the position.

96. Darrow questioned Mercer about the rationale for changing the qualifications in the job posting. Mercer told Darrow that Melena had instructed him to make the changes. Darrow then confronted Melena who shrugged off Darrow's concern that the changes made it more diffi-

cult for female and minority candidates to qualify for the position.

97. The City claims that the job requirement changes were not retaliatory, but rather part of its usual procedure of updating job requirements. This explanation is not credible because the job requirements for the Economic Development Director position, which was posted at the same time and at the same division head salary grade level, were not changed.

98. Melena testified that it was an error that the Economic Development Director job requirements were not changed in the June 15, 1984 posting. He testified that he noticed the omission and changed the job requirements in the national advertisements to conform with the changes made in the Housing Director job requirements. The actual national advertisements showed, however, that the job requirements for the Economic Development Director position had not been changed.

99. Because Daines filed the discrimination charge on June 6, 1984, the City altered the job requirements in its June 25, 1984, posting of the Housing Director vacancy.

100. The City changed the job requirements for the Housing Director in its job posting in retaliation against Daines for filing her discrimination charge on June 6, 1984.

101. Melena testified that, because of Daines' charge of discrimination, the City undertook a national search for Housing Director on or about June 22, 1984.

102. On July 3, 1984, when Daines filed retaliation charges against the City, the charge stated that she was experiencing reprisals including, but not limited to, changing the job description and threats of rescinding educational leave.

103. In retaliation for Daines' charges of discrimination and retaliation, Melena designed and oversaw an extended interview process for Housing Director which resulted in appointment of Stephanie Suttles, an external candidate, as Housing Director in September, 1984.

104. The City's retaliatory actions constitute clear and convincing evidence of its willful indifference to the rights of plaintiff.

105. Melena recommended a retaliatory interview process for the September, 1984 Housing Director appointment in a memo to Bassett in August, 1984. The two day interview process had never before been used by the City nor was there any evidence that it has been used since for any other vacancy. The interview process consisted of the seven candidates going through two days of dinners, tours, simulations, writing exercises and presentations as well an interview with Melena and the four-person interview panel.

106. As part of the interview process which he designed, Melena chose two City Council members and two others to be on the selection panel which was to conduct formal interviews of the seven final candidates for Housing Director. The City Council members were aware that Daines had filed discrimination charges against City.

107. Melena did not give a preference to Daines as an internal candidate for Housing Director in September, 1984. He did give a preference to Larry Forsythe as the internal candidate for the Economic Development Director position, which was being filled at the same time.

108. Daines did not receive a preference as an internal candidate in the September 1984 interview process in direct retaliation against her because she filed her charges of discrimination against the City.

109. The interview process utilized for selection of a Housing Director in September 1984, resulted in little weight being placed on Daines' prior work experience in public housing management with the Housing Division of the City.

110. The interview process gave no weight to the three objective job requirements contained in the job description for Housing Director, all of which Daines possessed.

111. Suttles did not have two of the three objective job requirements previously

needed for Housing Director, i.e., three years of responsible housing management experience and a Public Housing Managers Certificate.

112. The interview process was a subjective evaluation of the candidates based on information provided by Melena together with social interaction and a lay selection panel's review of verbal and written presentation skills.

113. Darrow wrote a performance evaluation dated August 30, 1984, recommending Daines for the Housing Director position and describing her performance as the Public Housing Program Administrator. Darrow sent the letter to Mercer, the Personnel Director, and asked that the evaluation be placed in Daines' personnel file. Bassett, however, returned the letter to Darrow and refused to place it in Daines' personnel file or pass it on to the interview panel for the September 1984 Housing Director appointment.

114. Bassett's refusal to allow the interview panel consider Darrow's recommendation of Daines for the Housing Director position was in retaliation against Daines for filing her charges of discrimination.

115. Melena did not show the position description for the Housing Director position to the interview panel. The panel was not informed of any objective criteria for judging the candidates.

116. During Daines' interview with the interview panel, one of the city council members asked her if she thought she could carry out the duties of the job while she had discrimination charges pending against the City. She expressed concern as to Daines' ability to do so. Melena was present throughout the interview. The charges named the City, Melena and Bassett as discriminating and retaliating against Daines.

117. The interview panel considered Daines' charges of discrimination as a negative factor in her selection as Housing Director in the September 1984 interview process.

118. The interview panel did not recommend Daines for appointment as Housing Director in September of 1984 and Bassett did not appoint her.

119. Daines did not receive the Housing Director job on September 10, 1984, due to retaliation against her for having filed charges of discrimination and retaliation against the City on June 6 and July 3, 1984.

120. The City also carried out an interview process for the position of Economic Development Director at the same time as the interview process for the Housing Director job was conducted.

121. Melena decided upon the interview processes used for both the Housing Director and Economic Development Director vacancy fillings in September 1984. The simple selection process for the Economic Development Director position contrasted with the Housing Director selection procedures.

122. For the Economic Development Director position, Melena appointed an interview panel consisting of two of the City Department Heads with whom he had conducted discussions about the Daines charge of discrimination filed in June 1984, namely, City Attorney Michael McCauley and Personnel Director Ben Mercer. He also appointed a friend from outside City employment to serve as a third member of the interview panel.

123. The Economic Development Director selection process differed in several significant respects from the process for the filling of the Housing Director position. At least two of the panel members were aware of the objective job requirements for the Economic Development Director job. Mercer knew because he had worked with the job descriptions. McCauley knew because it was part of the decision reached at meetings held by City officials to decide how to deal with the Daines charge of discrimination filed on June 6, 1984. Conversely, the Housing Director interview panelists were not aware of the job requirements.

124. The entire Economic Development Director process involved only three candidates, Forsythe and two outside candidates, whom Melena had selected as final-

ists to be interviewed by the panel. Conversely, the Housing Director interview panel was asked to narrow the 21 candidates to seven finalists to be interviewed.

125. The entire involvement of the candidates and the interview panel in the Economic Development selection process consisted of an approximately one hour interview with each of the three finalists and the panel's recommendation to Melena to appoint an outside woman candidate. Conversely, the Housing Director process involved all seven finalists in an elaborate two day process which included interviews, mock press conferences and written and oral presentations.

126. When the interview panel for Economic Development Director recommended to Melena that the City appoint a woman candidate for the position, the recommendation was not followed and Forsythe was appointed to the position in September 1984.

127. Plaintiff's claims of discrimination and retaliation occurring subsequent to her June 6, 1984 and July 3, 1984 EEOC filings are like and reasonably related to the substance of the discrimination and retaliation charges in those filings.

128. From July 16, 1984 through July 1, 1985, Daines attended the University of Chicago masters degree program while on educational leave from her position as Mankato Assistant Planner.

129. Daines would not have taken an educational leave requiring her absence from Mankato if she had been appointed Housing Director in May or June 1984.

130. Daines would have returned to the City in July 1985 or anytime subsequent had she been appointed Housing Director.

131. Had she been appointed Housing Director in 1984, Daines would have enrolled in the masters program at Mankato State University, using the same City policy that Melena and Forsythe and others had used to complete their masters degrees while employed by the City.

132. In July 1985, Daines informed the City of Mankato that she would not return to her Assistant Planner position. Daines did not return to the Assistant Planner job because of the pending litigation with the City coupled with the facts that she was not guaranteed advancement to Associate Planner at the City, and her Assistant Planner position had been eliminated from the budget to fund the then newly-recreated position of Economic Development Director. Daines' decision not to return was reasonable.

133. After completing the graduate program at the University of Chicago in July of 1985, Daines looked for positions comparable to the Mankato Housing Director position.

134. Daines worked for the Historic American Building Survey and the United States Department of National Parks as a consultant from June to September 1985. From October 1985 to July 1986, Daines worked as a Research Assistant for the Chicago Rehab Network. From July 1986 to present, Daines has worked as an Associate Planner for the City of Dubuque, Iowa.

135. Daines, in 1989, did not know that the City had opened the Housing Director job to external applicants until after the period to apply had closed. She knew that Barrett had been appointed Acting Housing Director and learned of the advertised position in May 1989 after the application period had closed.

136. It would be inequitable to order instatement of plaintiff to the position of Housing Director.

137. Daines voluntarily withdrew from the full-time employment market when she took an educational leave of absence from July 16, 1984 to July 1, 1985 to pursue a full-time graduate degree program.

138. Plaintiff has suffered loss of income from the job of Housing Director, from May 21, 1984 through December 31, 1989, excluding the period that she was on voluntary educational leave, from July 16, 1984 through July 1, 1985. She is therefore entitled to backpay for the period from May 21, 1984 through July 15, 1984 and from July 2, 1985 through December 31, 1989.

139. Plaintiff has reasonably mitigated her damages to the extent of the income she has earned and the benefits received from May 21, 1984 through July 15, 1984 and from July 2, 1985 through December 31, 1989.

140. Based on the evidence and calculations proffered by the parties, the Court, in its discretion, determines that plaintiff should be awarded backpay and front pay in an amount totalling $94,000 and punitive damages in the amount of $6,000.

141. This award adequately compensates plaintiff and therefore pre-judgment interest is not awarded.

142. Injunctive relief is not appropriate under the facts of this case.

## CONCLUSIONS OF LAW

1. The Court has federal question jurisdiction over Daines' Title VII claims.

2. The Court has pendent jurisdiction over Daines' claims under the Minnesota Human Rights Act ("MHRA").

3. Plaintiff's claims of discrimination and retaliation occurring subsequent to her June 6, 1984 and July 3, 1984 EEOC filings are like, and reasonably related to, the substance of the discrimination and retaliation charges in those filings. Plaintiff has therefore exhausted her EEOC administrative remedies.

4. The Court has subject matter jurisdiction over plaintiff's complaint of discrimination and retaliation with regard to events subsequent to her June 6, 1984 and July 3, 1984 EEOC filings including defendant's selection process for the September 1984 hiring of a housing director.

5. The City discriminated against Daines in failing to appoint her Housing Director on May 21, 1984, in violation of Title VII and Minn.Stat. § 363.03.

6. Under the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), Daines has proven a prima facie case of sex discrimination in the City's failure to appoint her as Housing Director in May 1984.

7. The City's proffered reasons for failing to appoint Daines Housing Director in May 1984 are pretextual.

8. Daines would have been Housing Director from May 21, 1984 to the present absent the City's discrimination against her.

9. Because Daines had filed EEOC charges of discrimination and retaliation, the City retaliated against her by making adverse employment decisions, specifically, decisions to change the Housing Director job description and to implement a burdensome selection procedure not used before or since. This retaliation violated Title VII and Minn.Stat. § 363.03.

10. Under the analysis set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989), Daines has proven by direct evidence that the City retaliated against her in violation of Title VII.

11. The City failed to prove that, absent a retaliatory motive, it would have made the same adverse employment decisions regarding the job requirements and selection process used to fill the Housing Director position.

12. Under a *McDonnell Douglas* analysis, for purposes of her claim under the MHRA, Minn.Stat. § 363.03, Daines has proven a prima facie case of retaliation in the adverse employment decisions made by the City as a result of her EEOC charges of discrimination and retaliation.

13. The City's proffered reasons for its adverse employment decisions against Daines are pretextual.

14. The City's retaliatory actions so tainted the selection process that the City cannot use Daines' performance in that process to rebut her claim of retaliation or to prove that the City would have made the same adverse employment decisions absent a retaliatory motive.

15. Daines is not entitled to back pay for the period that she was on a voluntary educational leave, from July 16, 1984 through July 1, 1985.

16. The Court has discretion to award frontpay in lieu of instatement.

17. The Court has discretion to order injunctive relief.

18. An award of prejudgment interest on a claim against a municipality is within the discretion of the Court.

19. Plaintiff's claim for punitive damages is cognizable under Minn.Stat. § 363.071, subd. 2, and is not subject to the procedural requirements of Minn.Stat. § 549.191.

20. Punitive damages are appropriate because plaintiff has shown clear and convincing evidence that the City's retaliatory actions against her demonstrated a willful indifference to her rights.

21. Plaintiff is entitled to reasonable attorneys' fees and costs.

## ORDER FOR JUDGMENT

Wherefore, IT IS HEREBY ORDERED that:

1. Daines is hereby awarded backpay and frontpay in an amount totalling $94,-000.

2. Daines is hereby awarded $6,000 in punitive damages under the Minnesota Human Rights Act.

3. Daines is hereby awarded reasonable attorneys' fees and costs.

## MEMORANDUM

■ Defendant argues that this Court does not have jurisdiction over plaintiff's claims of discrimination and retaliation occurring subsequent to her June 6, 1984 and July 3, 1984 EEOC filings. While a charge of discrimination under Title VII must be filed within 180 days from the date of the alleged unlawful employment practice, *Walker v. St. Anthony's Medical Center*, 881 F.2d 554, 556 (8th Cir.1989), the Eighth Circuit has determined that once a charge has been filed, continuing incidents of discrimination may be considered in reference to the original charge. *Anderson v. Block*, 807 F.2d 145, 148 (8th Cir.1986). Recognizing that "needless procedural barriers" would be put up if courts required plaintiffs to file a new administrative charge with each continuing incident of discrimination, the *Anderson* court held:

A plaintiff will be deemed to have exhausted administrative remedies if the allegations of the judicial complaint are like or reasonably related to the administrative charges that were timely brought. *Id.*

Plaintiff alleged in her EEOC filings that defendant discriminated against her by failing to appoint her as Housing Director in May 1984 and then retaliated against her for filing a discrimination charge with the EEOC. Plaintiff claims that defendant continued to discriminate and retaliate against her in the selection process that resulted in the September 1984 appointment of Stephanie Suttles as Housing Director. The Court finds that these claims are like and related because they all involve the 1984 selection of a Housing Director for the City of Mankato and alleged retaliatory actions taken as a result of plaintiff's original EEOC charge of discrimination. This Court can properly exercise jurisdiction over all plaintiff's claims of discrimination and retaliation.

■ Plaintiff asserts that the Court should use the analysis set forth by the United States Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1787-88, 104 L.Ed.2d 268 (1989) to decide her claim of disparate treatment discrimination in the May 1984 appointment of Forsythe as Housing Director. However, the Court finds that the evidence offered by plaintiff in support of this claim does not have the directness necessary to trigger a *Price Waterhouse* analysis. As directed by the Supreme Court in *Price Waterhouse*, the Court, at some point, has to decide whether plaintiff has proved that mixed motives are at work in a particular adverse employment decision. *Id.* 109 S.Ct. at 1789 n. 12. The determining factor of this decision is whether plaintiff has directly proved that "it is more likely than not that a forbidden characteristic played a part in the employment decision." *Id.* The Court is not persuaded that plaintiff has proved mixed motives in the May appointment of Forsythe as housing director.

However, this is not the end of the analysis. Plaintiff can still prevail under the analysis set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), if she establishes the necessary prima facie case and proves that the City's stated reason for its decision are pretextual. *Id.* 411 U.S. at 802–804, 93 S.Ct. at 1824–25.

The Court finds that plaintiff has shown that she is a qualified member of a protected class who was denied the Housing Director position under "circumstances which allow the court to infer unlawful discrimination." *Walker v. St. Anthony Medical Center*, 881 F.2d 554 (8th Cir.1989). Plaintiff has shown that she is a member of a protected class who was "qualified for her position and satisfied its normal requirements." *Id.* at 557.

Defendant promoted Forsythe, a member of a non-protected class. Plaintiff was the only then-current City employee who met the requirements stated in the job description in effect at the time Forsythe was promoted. In addition, Dale Darrow, the former Housing Director and plaintiff's supervisor for three years in the Housing Division, evaluated her as the most qualified person for the position when compared to other City employees.

To meet the next step of the *McDonnell Douglas* analysis, the City articulated several reasons for its non-promotion of Daines. Because these reasons can be categorized as subjective, the Court takes particular heed of the Eighth Circuit's admonition in *Royal v. Missouri Highway and Transportation Comm'n*, 655 F.2d 159 (8th Cir.1981):

> When the evaluation is in any degree subjective and when the evaluators themselves are not members of the protected minority, the legitimacy and nondiscriminatory basis should be subjected to particularly close scrutiny by the trial judge.

*Id.* at 164. The Assistant City Manager, Thomas Melena, testified that he considered Daines for the position but did not believe her skills and experience best met the immediate needs of the job. Bassett, who made the final decision as to Forsythe's appointment, stated that he relied on Melena's assertion that Daines was not qualified. However, numerous factors lead this Court to conclude that this justification is pretextual.

Melena lacked direct contact with Daines' work from which to make such an evaluation. Daines testified that, at most, she had three to five professional interactions with Melena, none of which would have given him sufficient exposure to evaluate her skills and experience. Attempts to shore up Melena's assessment of plaintiff's qualifications with easily-refuted allegations about dress and speaking skills only serve to weaken the credibility of his evaluation of plaintiff.[1]

Defendant contends that Forsythe had superior skills and experience based on his higher grade position with the City, possession of a master's degree, experience in supervision, and performance in his prior position. Yet in a memorandum recommending Forsythe, Melena stated that Forsythe's appointment as Housing Director would give him "hands on experience in supervising," "expand his career opportunities," and make "growth opportunities available to him." (Plaintiff's Exhibit # 47).

The City also asserts that Darrow did not advocate Daines for the position when the May appointments occurred. In May, however, Darrow did not even know that the City was considering other persons for the Housing Director position. Melena announced Forsythe's appointment as a *fait accompli* at a meeting of Melena, Darrow and Forsythe in early May 1984. Once Darrow knew that the position was open, he recommended Daines as the most qualified internal candidate.

Defendant, in seeking to rebut Darrow's testimony, put considerable weight on prob-

---

1. Melena testified that Daines did not dress properly and gave as an example, that she wore combat "fatigues" to work. Daines testified that she never owned combat fatigues. Melena testified that Daines lacked communication skills, but Daines testified that she did not think that Melena had ever heard her make a presentation prior to May 1984.

lems the Housing Department had been having with HUD. It attributed these problems to Darrow, and Melena testified that he felt it important to have someone in the Housing Director position who was not a part of the old Housing Division. This justification lacks credence. No evidence was presented that Daines was responsible for any of the alleged HUD problems, nor that HUD was unwilling to work with either Darrow or any of his subordinates. Further, no mention of the HUD issues was made to the Minnesota Department of Human Rights in its letters of July 13 and 30, 1984, explaining its appointment of Forsythe, thus lending support to plaintiff's argument that this justification was *post hoc* and pretextual.

■ Other evidence supports the Court's conclusion that the City discriminated against plaintiff in its May appointment of Forsythe. Plaintiff proffers statistical evidence of discrimination in the testimony and analysis of its expert witness Dr. Rebecca Klemm. Examining the City's appointment of women to the EEOC job category of "Officials and Administrators" during the period from January 1, 1975 through June 6, 1986, the date on which Daines filed her first charge, Klemm found that the City appointed twenty-two men and no women to such positions. Klemm concluded that this disparity is statistically significant, ranging from 2.71 to 3.11 standard deviations. She came to this conclusion by determining that the availability of women for the relevant positions, based on standard and accepted statistical sources for employment data,[2] ranges from 28.36% female to 33.62% female. Dr. Klemm had to rely on such statistical sources because defendant did not keep applicant data for the time period in which Klemm did her analysis.

Assuming the validity of Klemm's data, the deviations she found are sufficient to establish statistical significance and thereby undercut the hypothesis that it was chance rather than discrimination that caused the disparity. *See Castaneda v. Partida*, 430 U.S. 482, 496–97 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); *Hazelwood School District v. United States*, 433 U.S. 299, 311 n. 17, 97 S.Ct. 2736, 2743 n. 17, 53 L.Ed.2d 768 (1977).

Defendant argues that Klemm's statistics are invalid because they use an availability rate that does not reflect actual applicant flow data. The City cites data from positions filled in 1988 and 1989 showing availabilities ranging from 6% to 20% excluding the housing director position which had an availability of 28%. This information tempers the strength of plaintiff's argument, but does not undermine it. Applicant flow data was not available for the time period studied by Klemm, although the City's Affirmative Action Plan, in place since 1974, required department heads to document all applicants rejected for position openings. The data she used was based on the 1980 census which fell in the middle of the relevant period. As stated before, this same data source was used in defendant's 1988 Affirmative Action Plan. The actual applicant pool for the 1984 Housing Director position matched the statistics from that census, lending credibility to her conclusion.

The Court finds that plaintiff's statistical evidence supports an inference of discrimination. Minimally, the fact that no women were appointed into the officials and administrators category "is surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow." *MacDissi v. Valmont Industries, Inc.*, 856 F.2d 1054, 1058 (8th Cir.1988). The Eighth Circuit has asserted that "quantitative evidence [used as circumstantial evidence] does not need to reach the degree of certainty required of plaintiffs who present no proof of discrimi-

**2.** Klemm used data from state and federal census records maintained at the State of Minnesota Department of Jobs and Training, Research and Statistics Office, reflecting detailed occupational availabilities *as of 1980* in all job categories in the United States as a whole and within Minnesota counties, including Blue Earth and Nicollet counties. Klemm noted the City used the same data base in its 1988 Affirmative Action Plan to determine the availability of women for positions within the City. That plan indicated the availability of women for "Manager/Administration" jobs as 32.4%.

nation besides a statistical pattern." *Id.* *See also Estes v. Dick Smith Ford, Inc.,* 856 F.2d 1097, 1103 (8th Cir.1988).

Other circumstantial evidence supporting the inference of discrimination includes the City's failure to consistently follow its Employee Relationship Policy requiring the City to post and advertise vacancies. The City justified its appointment of Forsythe without posting and advertising by characterizing it as a transfer. However, plaintiff presented evidence that in appointments to Assistant Planner positions, the City appointed four men without posting/advertising, while the two women who were appointed during the same period had to apply for the position and compete with other candidates. Also relevant is Melena's question to Daines during her interview for an Assistant Planner position as to whether she could be "one of the boys."

The Court concludes that the City discriminated against Daines because of her gender in its appointment of Forsythe to the position of Housing Director in May 1984. The City's affirmative action efforts may have resulted in Daines' promotion to assistant planner and receipt of an educational leave of absence, but the evidence leads to a conclusion that a "glass ceiling" of gender discrimination prevented Daines from making the step up with the City to an officials and administrators position.

Given the finding that plaintiff has proven discrimination based on disparate treatment, the Court does not find it necessary to reach plaintiff's claim of disparate impact.

■■■ Plaintiff asserts that the City retaliated against her for her June 6, 1984 EEOC charge of sex discrimination based on Forsythe's appointment. Plaintiff alleges that following her filing—an activity protected under Title VII and the MHRA— the City, although it reopened applications for the Housing Director position, took the adverse employment actions of changing the job requirements and utilizing an intensive, presentation-oriented interview process for the position, never used before or since. Melena admitted in his testimony that but for Daines' charge, the City would

have selected the most qualified internal candidate and none of the above actions would have been taken. The Court finds that this claim warrants analysis as a mixed-motive case under *Price Waterhouse.* Plaintiff has presented direct evidence that an impermissible retaliatory motive played a part in the adverse employment actions taken by the City. Direct evidence includes actions or remarks of an employer that reflect a retaliatory attitude. *Gray v. University of Arkansas at Fayetteville,* 883 F.2d 1394, 1398 (8th Cir.1989). The City contends that the actions of which Daines complains were not retaliatory, but were attempts to make the Housing Director selection in September as fair as possible. The Court is not persuaded. Adding the preference for a master's degree, which Daines did not have, and changing the experience requirement from "three years of responsible experience in housing management" to "3–5 years supervisory experience in housing or a related field" did not exclude Daines from eligibility for the position, but clearly put her in a less favorable position as a competitor for the job and broadened the pool of candidates. This action also assured that Forsythe would have objective qualifications for the position, which he did not have under the previous job description.

While the extended, presentation-oriented interviewing process may have been designed to test relevant skills, the fact remains that it had never been used before and has never been used since, thus subjecting Daines to a more burdensome and competitive process than had she not filed her charge. In addition, the City used an interview panel that included persons who were aware of Daines' charge. In the course of the interview, Daines was questioned about the impact of her discrimination charge on her performance in the job, evidence that her charge was considered a factor in the selection.

Following Daines' charge, the City also opened up the selection process for the Economic Director position, but neither changed the job requirements nor institut-

ed an interview process such as that used for the Housing Director position.

Other facts support the Court's conclusion that these actions were retaliatory. Plaintiff testified about Melena's angry demeanor towards her when he learned of her charge. A temporary secretary, Heather Weddle, testified that after Melena was notified of the charge, she heard him tell someone in his office that Daines can't expect her job when she comes back from her leave if she makes this charge. Weddle also typed a memorandum from Melena to Daines to the same effect. This memo was never sent and all evidence of it was destroyed at Bassett's insistence. In its selection process, the City refused to consider evaluations of Daines and another current employee, Mary Barrett, done by Darrow, the previous head of the Housing Department. All the facts, particularly the timing, the burdensome quality of the City's actions, and the different treatment of the Economic Director position lead the Court to conclude that the City's actions constitute direct evidence of retaliation.

Because the plaintiff produced direct evidence of retaliation in the actions of the City, the burden of proof shifts to the City to prove that it would have made the same adverse employment decisions absent any retaliatory motive.[3]

Defendant argues that Daines did not perform as well as either Suttles or Barrett and says that Suttles would have been selected as Housing Director under any circumstances because her performance in the selection process far surpassed the other candidates. However, the Court is of the opinion that this defense misses the mark. The adverse employment decisions on which the Court places its focus are the change of job requirements and the one-time use of a more burdensome selection process. Defendant has not proved that it would have made the same adverse employment decisions absent a retaliatory motive. But for Daines' charge, the City would not have subjected her to the changed requirements and the more burdensome selection process. Defendant indicated that but for Daines' charge, it would have selected the most qualified internal candidate. The Court finds that Daines was the most qualified internal candidate.

The City's adverse employment actions so tainted the selection process in September 1984 that Daines' performance in that process should not determine whether the City has shown that it would have taken the same adverse action absent a retaliatory motive. For the same reason, the Court also is not persuaded that the City's selection of a woman as a result of the selection process shows that the City lacked a retaliatory or discriminatory motive.

Having found the City liable for both discrimination and retaliation, the Court has discretion to fashion a remedy to make the plaintiff "whole," that is, to restore her "so far as possible to a position where [she] would have been were it not for the unlawful discrimination." *Ford Motor Co. v. EEOC,* 458 U.S. 219, 230, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982). "A district court is obligated to grant a plaintiff who has been discriminated against ... the most complete relief possible." *Briseno v. Central Technical Community College Area,* 739 F.2d 344, 347 (8th Cir.1984). Pursuant to 42 U.S.C. § 2000e–5(g), such affirmative action may include back pay, reinstatement or "any other equitable relief as the court deems appropriate." The defendant has the burden to rebut damages claimed by plaintiff and to prove any failure to mitigate those damages. *DiSalvo v. Chamber of Commerce of Greater*

---

**3.** In *Anderson v. Hunter, Keith, Marshall & Co.,* 417 N.W.2d 619 (Minn.1988), the Minnesota Supreme Court held that the *Price Waterhouse* analysis should not be used in mixed-motive cases under the MHRA. The Court finds that plaintiff also prevails under the *McDonnell Douglas* analysis. Defendant's justification of its adverse employment decision is that it was attempting to make the September Housing Director selection as fair as possible. The retaliatory nature of the City's actions and the other evidence of retaliatory motive offered by plaintiff establish the pretextual nature of defendant's justification for changing the job requirements and using the selection process it did.

*Kansas City,* 568 F.2d 593, 598 (8th Cir. 1978).

■ The Court finds that damages should be calculated beginning May 21, 1984, the date the City discriminatorily appointed Forsythe Housing Director. Defendant argues that, at most, plaintiff was denied the opportunity to apply and be considered for the Housing Director position, an opportunity which she had in September. At the same time, defendant continues to assert that it had the authority to simply transfer employees to effectuate an internal appointment to the Housing Director position. Because of discrimination, Daines was not transferred to that position. In any case, the retaliatory nature of defendant's response to plaintiff's June 6, 1984 discrimination charge nullifies any mitigating effect that the opening of the position for applications might have achieved, leaving the date of the original transgression as the appropriate starting point for the calculation of damages.

■ Defendant argues that a backpay award should not include the period from July 16, 1984 to July 1, 1985, when Daines was a full-time student on educational leave. The Eighth Circuit's opinion in *Washington v. Kroger Co.,* 671 F.2d 1072 (1982) provides guidance in resolving this issue. While vacating and remanding the lower court's decision on the issue of liability, the appellate circuit affirmed the district court's ruling on damages in the event that judgment would be reinstated on remand:

> [W]e need not hold in this case that back pay either does or does not continue to run in every case of a plaintiff who has chosen to go to school full-time. Here, the District Court evidently felt that plaintiff had effectively removed herself from the employment market. Some full-time students, those who attend classes at night, for example, are also full-time employees, but there is no evidence, at least none sufficient to persuade us to reject the trial court's finding, that [plaintiff] could have held a full-time job without curtailing her schooling. She did continue to seek em-

ployment, and actually earned some money while attending school, but the District Court excluded these earnings from the outside earnings offset against her backpay award. In the circumstances of this case, this resolution of the issue was fair.

*Id.* at 1079.

Pursuant to *Washington,* the Court has considered whether plaintiff "removed herself" from the full-time employment market. While plaintiff presented evidence that she applied for employment and, in fact, worked part-time, the facts indicate that she voluntarily withdrew from the full-time employment market to pursue a graduate degree at the University of Chicago. Plaintiff asserts that if she had been appointed as Housing Director she would have returned to Mankato, worked full-time, and pursued a master's degree at Mankato State University. The Court notes that plaintiff could have done this even if she were not appointed Housing Director. She chose, however, to study full-time, and obtained the benefit of earning a graduate degree within that time period. In *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263 (10th Cir.1975), the Court observed:

> When an employee opts to attend school, curtailing present earning capacity in order to reap greater future earnings, a backpay award for the period while attending school ... would be like receiving a double benefit.

*Id.* at 1079. In *Washington,* the Eighth Circuit cited this rationale from *Taylor* as an approach that "makes sense as a general rule." *Washington,* 671 F.2d at 1079. The Court finds that the *Taylor* rationale applies to the facts in this case and, therefore, that plaintiff is not entitled to backpay for the period during which she was a full-time student. Consistent with the method of calculation in *Washington,* Daines' actual earnings between July 16, 1984 and July 1, 1985 should not be deducted from her backpay award because she will not be receiving an award for that period. *See id.*

Defendant contends that plaintiff is not entitled to back pay for the period following her educational leave because she failed to mitigate her damages from July 2, 1985 onward. The City asserts that Daines voluntarily resigned from her position as assistant planner with the City as of July 1, 1985 and failed to use reasonable diligence to find substantially equivalent employment. Alternatively, defendant contends that if backpay for this period is allowed, the computation should be based on the difference between the Housing Director's salary and the amount she would have earned if she had continued working at the City, including a projected promotion to associate planner six months after she returned. The parties dispute whether this promotion would have been available given the re-shuffling of positions that occurred in May 1984. Minimally, the promotion was contingent on satisfactory performance.

■■■ The Court first observes that reasonable diligence obligates a plaintiff not to refuse a job substantially equivalent to the job denied. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32 n. 16, 102 S.Ct. 3057, 3065–66 n. 16, 73 L.Ed.2d 721 (1982). However, defendant has presented no evidence that plaintiff has refused any position substantially equivalent to a housing director position. Defendant also argues that rather than voluntarily resigning her position at the City, plaintiff should have returned to that position, or at least, to a position that paid an equivalent salary.[4] The Court thinks that the employment decisions made by plaintiff were part of a reasonable and good faith effort to achieve such a position and, therefore, were based on "mitigative motives." *See DiSalvo*, 568 F.2d at 598. The Court finds reasonable plaintiff's decision to remain and work in the Chicago area while she sought a position similar to the one she was denied in Mankato. Ultimately, plaintiff accepted a position as associate planner in Dubuque,

Iowa. In terms of career steps, this job was at least equivalent to the job she voluntarily resigned in Mankato.[5] Plaintiff was not obligated to not seek or to turn down such a position because it paid less than the position she had in Mankato.

■■■ Defendant argues that backpay should stop on May 30, 1989, the day that Mary Barrett became Housing Director, replacing Stephanie Suttles who had resigned as of September 5, 1988. (Barrett had served as acting director from September 5, 1988 until she became director in May 1989.) In the course of depositions, Michael McCauley and William Bassett had informed plaintiff's counsel that Suttles was leaving the Housing Director position and that the City would be interviewing for that position. Bassett had indicated he would consider plaintiff for the position and that the position had not yet been advertised. Defendant argues that plaintiff's claim should be cut off from May 30, 1989 because she had constructive, if not actual, notice of the vacancy, but did not apply. The Court is of the belief that the information given to plaintiffs' counsel was not of the type to constitute any sort of formal notice such that counsel's knowledge should be imputed to plaintiff. Plaintiff testified that she was aware that Suttles had left and knew that Barrett had been appointed acting director, but did not know the position was actually open until the application period had closed. Defendant did not inform her it was taking applications. Barrett was acting director for eight months and plaintiff had no way of knowing that Barrett would not simply be appointed to the position without a search as had occurred in the past. The Court does not find it appropriate to cut off damages as of May 30, 1989.

■■■ Plaintiff requests instatement to the Housing Director position and asks the Court to use the date of such instatement

---

**4.** In making this argument, defendant relies on *Carrero v. New York City Housing Authority*, 680 F.Supp. 87, 88 (S.D.N.Y.1987), the holding of which was reversed in *Carrero v. New York City Housing Authority*, 890 F.2d 569, 580–81 (1989).

**5.** At Mankato, the associate planner position was higher than that of an assistant planner. The Court does not know if the same is true in the Dubuque city planning department.

as the ending date of the period for which damages should be calculated. Defendant contends that plaintiff is not eligible for instatement. The City asserts that plaintiff's failure to apply for the Housing Director position when it became available in 1989 demonstrates that she does not have a primary interest in the job which is the subject of her lawsuit. The Court finds plaintiff's testimony credible both that she did not know that applications were being taken for the 1989 Housing Director's position until the deadline had passed, and that her request for instatement is serious—that is, that she would assume the Housing Director position under whatever equitable conditions the Court would structure.

However, establishing entitlement to instatement does not resolve the issue. In deciding whether to order plaintiff's instatement as Housing Director now, or by December 31, 1992, as requested, the Court must balance the equities of making the plaintiff whole, the possibility of injury to an "innocent incumbent," and the effect of such an order on the workplace involved. *See King v. Staley*, 849 F.2d 1143, 1144–45 (8th Cir.1988). The decision in this case is particularly difficult. The current Housing Director, Mary Barrett, is an innocent incumbent who would likely be displaced by such an order.[6] Although Thomas Melena is no longer employed by the City, William Bassett is still the City Manager, and the person to whom plaintiff would ultimately be responsible. The Court believes that instatement following this litigation would create a difficult work environment for plaintiff and for the City. On the other hand, plaintiff is willing to take this risk and obviously values the career opportunity the Housing Director position offers over other types of compensation that she could receive. This case shows the serious impact of a lost promotion opportunity,[7] an impact for which monetary compensation provides a less than satisfactory remedy. Nonetheless, the Court has determined that the appropriate relief in this case is monetary compensation in the form of backpay and frontpay.

■ The Court finds that backpay should be awarded from May 21, 1984 through December 31, 1989 with the exclusion of the period from July 16, 1984 to July 1, 1985. Using the evidence and calculations offered by the parties, the Court arrives at a total of $90,705.20.[8] Because of the extended period over which backpay accrued, the Court does not think a large frontpay award is appropriate. Therefore, the Court awards frontpay sufficient to bring plaintiff's compensatory award to a total of $94,000.

■ The decision whether to grant prejudgment interest is within the discretion of the Court as part of its efforts to make the plaintiff "whole." While the government cannot be subject to such a remedy without express waiver of sovereign immunity, *U.S. v. Alcea Band of Tillamooks*, 341 U.S. 48, 49, 71 S.Ct. 552, 552, 95 L.Ed. 738 (1951), municipalities are not protected by sovereign immunity's shield. Nonetheless, the Court finds the amount awarded plaintiff to be equitable without including prejudgment interest.

■ Effective August 1, 1984, the MHRA allows the Court to award an aggrieved party "compensatory damages in an amount up to three times the actual damages suffered." Minn.Stat. § 363.071

---

6. The Court does not think that plaintiff's suggestion of sharing the Housing Director position with Barrett is feasible.

7. Defendant argues that plaintiff's inability to find a housing director position following her employment at Mankato, proves that she was not qualified. The Court thinks otherwise. Loss of a key career opportunity, such as the Housing Director position, could have a detrimental effect on any person's career regardless of her qualifications. Melena was well aware of the value of experience in a director level position when he wrote to Bassett that the appointment of Forsythe to the Housing Director position would "expand his career opportunities." (Plaintiff's Exh. 47)

8. The Court used plaintiff's figure, from Exhibit 704, for damages without interest as a starting point and then subtracted benefit losses on leave, the salary plaintiff would have earned for the 11.5 months she was on leave, and a proportionate amount of the remaining items. Then plaintiff's earnings for the 11.5 months were added to the resulting amount.

subd. 2. The Court has already ruled that treble damages may be available for damages related to events occurring subsequent to August 1, 1984 on which plaintiff bases her retaliation claim. The Court understands that this statute provides the Court with some flexibility in providing a monetary remedy when the actual damages do not provide equitable relief. Since the Court believes it can fashion equitable monetary relief through other means, it intends to do this rather than try to determine what proportion of the plaintiff's damages were incurred by defendant's actions after August 1, 1984.

■ As to punitive damages, defendants argue that such a claim is barred because plaintiff failed to follow the motion and affidavit requirements of Minn.Stat. § 549.191.[9] Plaintiff argues that she is not required to comply with § 549.191 because her claim for punitive damages is being brought under the MHRA which incorporates § 549.20, the substantive standard for awarding punitive damages, but does not require compliance with § 549.191. The language in the MHRA allowing punitive damages states:

> the administrative law judge may also order the respondent to pay an aggrieved party, ... punitive damages in an amount not more than [$6,000].[10] Punitive damages shall be awarded pursuant to section 549.20.

Minn.Stat. § 363.071, subd. 2. The Court finds persuasive plaintiff's argument that the legislature's reference to § 549.20 in the MHRA does not result in automatic incorporation of the requirements of § 549.191 as well. The protections against excessive punitive damages awards provided by § 549.191 are not necessary in MHRA actions which are heard and decided by a hearing officer or judge. Also persuasive is the fact that the MHRA allows hearing officers or a judge to award various remedies regardless of whether the plaintiff requests some or all of them.

■ Pursuant to Minn.Stat. § 549.20, the Court may grant punitive damages "upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights ... of others." The Court finds that plaintiff has presented clear and convincing evidence supporting her claim that the City retaliated against her because she filed an EEOC discrimination charge. Factors relevant to the Court's decision to award punitive damages include the "seriousness of hazard to the public arising from the defendant's misconduct," and "the attitude and conduct of the defendant upon discovery of the misconduct." Minn.Stat. § 549.20, subd. 3. The effectiveness of civil rights statutes is highly dependent on a complainant's ability to file charges without fear of retaliation by employers. The Court is of the opinion that the City's violation of the MHRA's prohibition of reprisals, Minn.Stat. § 363.03, subd. 7, constitutes a serious hazard to the public. Plaintiff filed her retaliation charge in July 1984 giving the City due notice of her allegations. Nonetheless, the City continued to act in a retaliatory manner. The Court concludes that punitive damages in the amount of $6,000 are appropriate.

■ Finally, the Court turns to plaintiff's request for injunctive relief, specifically, that the Court order the City to follow certain procedures in filling vacancies in the officials and administrators category, to exercise a preference to equally well-qualified women candidates for those vacancies, and to promote internal and external candidates at a ratio of one woman to one man until the utilization reaches the availability of women. Under the facts of this case, the Court finds that injunctive relief is not warranted. The City has advertised, posted and held interviews for all

---

9. This Court has followed the lead of other Minnesota district court judges in generally requiring plaintiffs to follow the requirements of § 549.191 when claiming punitive damages under a state law cause of action. *See Fournier v. Marigold Foods, Inc.,* 678 F.Supp. 1420 (D.Minn. 1988).

10. At the time plaintiff filed her complaint, punitive damages were capped at $6,000, the amount applicable to this case. In 1988, the legislature raised the maximum amount to $8,500.

positions in the administrators and officials category since plaintiff's charges were filed. Most important, since 1988 the City has been operating under a revised affirmative action policy as required of municipalities by statute. That policy is thorough and aggressive in its approach to affirmative action. However, the Court is aware that at the time the discrimination and retaliation occurred against Daines, the City was also supposedly operating under a 1974 affirmative action plan. Nonetheless, the damages awarded plaintiff and the punitive damages imposed as a result of the City's retaliation should motivate the City to follow the revised policy now in place to remediate the underutilization of women in its workplace and avoid similar lawsuits in the future.