Carl W. ENGELE, Jr., individually and as parent and natural guardian of Daniel L. Engele, Plaintiff,

v.

INDEPENDENT SCHOOL DISTRICT NO. 91, Thomas V. Hoppe, John W. Braun and Larry G. Johnson, Defendants.

Civ. No. 5-92-171.

United States District Court, D. Minnesota, Fifth Division.

March 21, 1994.

James Walter Balmer, Sean Michael Quinn, Falsani Balmer Berglund & Merit, Duluth, MN, for plaintiff.

Mark J. Hill, Mary A. Rice, Jardine Logan & O'Brien, St. Paul, MN, Raymond Lee Tahnk–Johnson, Hayes & Assoc., Eagan, MN, for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on defendants' motion for summary judgment. Based on a review of the file, record and proceedings herein, and for the reasons stated below, the motion of defendants is granted in part and denied in part.

## BACKGROUND

Daniel Engele ("Engele") is an Asian–American boy of Korean descent. Between 1988 and 1990, Daniel attended the Barnum Elementary School for fifth and sixth grade. While in fifth grade, Daniel started having problems with a group of his classmates who were white. The classmates began calling Daniel "slant-eyed commie," "chink" and "gook" on a daily basis. There is evidence that Daniel was called racist names in front of teachers. Daniel claims that on one occasion he discussed the problem with his sixth grade teacher, Beryl Rieke, and on a different occasion with Rita Johnson, another school teacher. Daniel contends that he told Mrs. Rieke and Mrs. Johnson that his classmates were calling him racist names. Both teachers allegedly expressed concern and indicated that they would try to take care of the problem. The classmates, however, con-

tinued to call Daniel racist names on a daily basis. Daniel also claims he was the victim of ongoing assaults.

In the spring of 1990, Daniel apparently made peace with Phillip Sheldon ("Sheldon"), one of his classmates who had been harassing him. In May 1990, with less than two weeks remaining in the school year, Sheldon was killed in a recreational vehicle accident. The next day on the bus many students were discussing Sheldon's tragic death. At some point, a student told a joke that caused Daniel to laugh. Daniel's laughter angered his classmates, prompting them to begin a rumor that Daniel said he was glad Sheldon was dead and was laughing about his death.

The Barnum School District provided voluntary counseling sessions to help the students cope with their grief. Daniel's classmates attended a session with Pastor Dan Rieke. The classmates reported that Daniel had said he was glad Sheldon was dead; two classmates threatened that Daniel would "pay" for making the comment. Daniel was summoned to the session to try to resolve the conflict. Daniel denied making the callous remark. The classmates threatened to "get even" with Daniel unless he admitted making the statement and apologized. After encouragement from Pastor Rieke, Daniel relented and admitted making the remark and apologized. The classmates left the session angry and Daniel stayed behind.

Daniel told Pastor Rieke that he was scared by the threats because one classmate had a knife and the others would use their fists.[1] Daniel told Pastor Rieke that he would feel safer if he was allowed to go home and finish the balance of the school year there. Pastor Rieke said he would relay Daniel's concerns to the school principal, John Braun ("Braun"). Pastor Rieke met with Braun and indicated that the situation was serious. The school psychologist, Larry Johnson ("Johnson"), confirmed the volatile nature of the situation after meeting with Daniel individually and with his classmates. Braun met with Johnson and Thomas Hoppe, the school superintendent, to discuss the situation. Several options were considered but it was ultimately decided that Daniel should complete the school year at home for his personal safety.

Braun made clear that Daniel was not being punished for anything he might have said on the bus and Daniel concedes he was sent home for his safety. After telephoning Daniel's grandfather, Braun and Johnson took Daniel to his grandparents' home. Braun told Daniel's grandfather that Daniel was released for the rest of the school year for his protection. Braun then met with Daniel's classmates and warned them that threats and violence would not be tolerated. Braun indicated that the offending classmates would be held responsible if Daniel was harmed. In all, seven or eight students had threatened to harm Daniel. The classmates were not otherwise disciplined and were allowed to attend school for the rest of the year. Daniel stayed home during the last ten days of the 1990 school year. Homebound instruction was offered and school work was sent home but Daniel did not complete it. Daniel's academic standing apparently did not suffer, however, and he was passed to the seventh grade.

Daniel's father, Carl W. Engele, Jr. ("plaintiff"), brought suit on behalf of Daniel in federal court pursuant to 42 U.S.C. § 1983, asserting violations of Daniel's Fourteenth Amendment rights to due process and equal protection. Plaintiff alleges that defendants excluded Daniel from school without due process of law and violated equal protection by excluding Daniel from school while his white classmates who made threats were permitted to attend school for the remainder of the year. Plaintiff also asserts a cause of action under the Minnesota Human Rights Act. Defendants move for summary judgment on the section 1983 claim and seek to dismiss the state law claim based on immunity.

## DISCUSSION

The court should grant summary judgment "if the pleadings, depositions, answers to in-

---

1. Pastor Rieke did not see a knife; nor did any of Daniel's classmates threaten to use a knife during the session.

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510.

■ On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in her favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552.

### 1. Section 1983 Claim

■ Section 1983 of Title 42 creates no substantive rights, but provides only a remedy when rights secured by federal law or the Constitution are deprived under color of state law. *Lugar v. Edmondson,* 457 U.S. 922, 924, 102 S.Ct. 2744, 2746, 73 L.Ed.2d 482 (1982). An underlying constitutional right must exist before a cause of action under section 1983 will lie. Plaintiff must show that the defendants violated a right, privilege or immunity protected by the Constitution or laws of the United States. The Fourteenth Amendment forbids state actors to "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. It also prohibits states to "deny to any person within its jurisdiction the equal protection of the laws." *Id.*

### A. Claim Against the School District

■ The school district is liable under section 1983 only if an official policy or custom caused a violation of Daniel's constitutional rights. *Monell v. New York Dep't of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978); *Duerscherl v. Foley,* 681 F.Supp. 1364, 1368–69 (D.Minn.1987), *aff'd,* 845 F.2d 1027 (8th Cir.1988). To avoid summary judgment, plaintiff must produce evidence sufficient to show a school district policy or custom violated Daniel's constitutional rights. Plaintiff has failed to make the requisite showing.

■ Plaintiff did not allege that an official school district policy violated Daniel rights guaranteed by the Constitution. The complaint is also devoid of any specific facts indicating the existence of such a policy. Accordingly, plaintiff's section 1983 claim against the school district is subject to dismissal under Rule 12(b)(6). Even if the claim were adequately pled, plaintiff has not made any showing that a school district policy or custom violated Daniel's constitutional rights. There is no evidence whatsoever that the school district had a policy, official or otherwise, for excluding students from school without due process or law. The evidence also fails to establish any school district policy to treat students differently because of their race or national origin. Without a showing of an official policy or custom that caused the alleged constitutional violations, plaintiff's section 1983 claims against the school district must fail.

### B. Procedural Due Process

■ In order to maintain a due process claim, plaintiff must point to specific facts

which, if proven, would establish that defendants deprived Daniel of a constitutionally protected property or liberty interest. *Board of Regents v. Roth*, 408 U.S. 564, 569–71, 92 S.Ct. 2701, 2704–06, 33 L.Ed.2d 548 (1972).[2] Defendants concede that students facing expulsion or suspension from public school have property and liberty interests that qualify for protection under the due process clause. *Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975). In *Goss*, the Supreme Court held that states may not withdraw the right to education "on the grounds of misconduct, absent fundamentally fair procedures to determine whether the misconduct has occurred." *Id.* (citation omitted). Defendants contend that because Daniel was not expelled, suspended or dismissed from school for misconduct, the Due Process Clause is not implicated. Plaintiff concedes that Daniel was not punished and that he was removed from school premises for his protection. Nonetheless, plaintiff insists that, regardless of the motivation, Daniel's exclusion from school triggers due process protection.

■ It is undisputed that the Supreme Court in *Goss* was concerned with the exclusion of students from the educational process based on misconduct.[3] However, the Eighth Circuit has held that, given the importance of education, due process is implicated where a student is excluded from public school for other reasons than misconduct. *See Horton v. Marshall Public Schools*, 769 F.2d 1323, 1333 (8th Cir.1985) (exclusion of students from public school based on ineligibility under state law). Thus, the court concludes

that Daniel could not be excluded from public school for 10 days without being afforded some minimum due process protection.

■ Defendants also contend that due process is not implicated because the interference with Daniel's liberty or property interest was *de minimis*. *See, e.g., Goss*, 419 U.S. at 576, 95 S.Ct. at 737. Defendants argue that because homebound instruction was offered and school work was sent home to Daniel, any deprivation of Daniel's right to public education was *de minimis*. Plaintiff responds that although Daniel's school work did not suffer, his removal from public school deprived him of constitutionally protected educational benefits.

The intangible benefits of attending public school have long been recognized and protected by the federal courts. *See Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 690, 98 L.Ed. 873 (1954). The Supreme Court has consistently held that the existence of a protected liberty or property interest does not depend on the gravity of the loss inflicted by the government's action. Rather, to determine whether due process requirements apply, the court "must look not to the 'weight' but to the *nature* of the interest at stake." *Roth*, 408 U.S. at 570–71, 92 S.Ct. at 2705–06 (emphasis in original). The court concludes that the severity of the deprivation is not decisive of Daniel's basic right to due process, although it is an important factor to weigh in determining what process is due. *See, e.g., Goss*, 419 U.S. at 576, 95 S.Ct. at 737 (quoting *Fuentes v. Shevin*, 407 U.S. 67, 86, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972)).[4]

**2.** Plaintiff initially asserted that the defendants violated the Fourteenth Amendment by failing to protect Daniel from the threats and assaults of his classmates. Plaintiff did not directly address this theory in his brief and appeared to abandon it in oral argument before the court. The court notes that such a claim would fail in light of the Eighth Circuit's decision in *Dorothy J. v. Little Rock School District*, 7 F.3d 729 (8th Cir.1993). In *Dorothy J.*, a student claimed that his due process rights were violated because the school district and its employees as state actors failed to protect him from assault by another private actor. *Id.* at 731. The Eighth Circuit determined that the state did not a owe constitutional duty to protect students who attended public school under state mandate. *Id.* at 732. Thus, defendants

had no constitutional duty under the Fourteenth Amendment to protect Daniel from his peers.

**3.** *See Goss,* 419 U.S. at 581, 95 S.Ct. at 739 (Due Process Clause requires at least "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.").

**4.** The court recognizes that there was an immediate need to send Daniel home for his safety and to preserve school order. In fact, plaintiff admits there was a legitimate need to remove Daniel from school without delay. If Daniel had only been sent home for one day to restore security, the Due Process Clause would not be implicated because any deprivation would have been *de*

■ "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Plaintiff claims that the procedure employed by defendants in excluding Daniel afforded him inadequate notice and opportunity to be heard. The court disagrees. Daniel requested to be sent home and was told by school officials that he would finish the school year at home for his safety. Daniel consented to his removal from school; neither Daniel or his father complained about his exclusion from school until after the school year had ended. The Supreme Court's decision in *Goss* guarantees the student an "informal give-and-take" with school officials preferably prior to his exclusion from school. *Goss,* 419 U.S. at 584, 95 S.Ct. at 741. Daniel received this opportunity. Daniel was given adequate notice of the reasons for his exclusion and an opportunity to explain his side of the story. While the initial counseling session did not satisfy this requirement, the individual meetings with Pastor Rieke and Johnson allowed Daniel an opportunity to explain his side of the story in a neutral setting.

The Eighth Circuit has recognized that, absent a factual dispute, "it is sufficient that the school district give the student notice of the reasons for which he will be excluded from school and an opportunity to respond to and contest those reasons if the student desires." *Horton,* 769 F.2d at 1334. Plaintiff insists that more process was due because there was a factual dispute concerning whether Daniel made the statement attributed to him. Daniel was not excluded from school based on anything he might have said about Sheldon's death. Rather, Daniel was removed from school premises for his safety and because he had requested to go home. Those facts are not disputed. Plaintiff also complains that Daniel did not have an advocate during the hearing afforded. Trial-type procedures do not extend to brief exclusions from school. Rather, students are entitled to only rudimentary procedural safeguards. *Goss,* 419 U.S. at 581, 95 S.Ct. at 739. The

court is satisfied that Daniel's due process rights were respected and that Daniel received all process due to him.

## C. Substantive Due Process

■ Plaintiff can show that Daniel's right to substantive due process was denied if the defendants' decision to exclude him from school was arbitrary or capricious. *Littlefield v. City of Afton,* 785 F.2d 596, 607 (8th Cir.1986). Plaintiff claims that the defendants should have excluded the classmates who made threats against Daniel, rather than exclude Daniel from school. The court affords great deference to school administrators in matters such as maintaining order in the schools. The defendants' objective to protect Daniel was legitimate. Daniel requested to finish the rest of the school year at home and the defendants, after considering several options, decided that temporarily excluding Daniel from school was the best way to ensure his safety. The decision to exclude Daniel from school and provide homebound instruction was rationally related to that interest. Thus, the court concludes that plaintiff has failed to show that defendants violated Daniel's substantive due process rights.

## D. Equal Protection

To state an equal protection claim, plaintiff must establish that defendants treated Daniel differently because of his race or national origin. Plaintiff claims that defendants violated equal protection by excluding Daniel from school based on safety concerns and not excluding or otherwise punishing his white classmates. There is absolutely no evidence that defendants treated Daniel differently based on his race or national origin. The undisputed evidence shows that defendants acted out of genuine concern for Daniel's safety. Moreover, plaintiff conceded in his deposition that the actions taken by defendants were not based on Daniel's race or national origin. Accordingly, the court concludes that plaintiff has failed to show that

---

*minimis.* The court need not address that hypothetical situation, however, as Daniel was excluded from attending school for 10 days, not one.

defendants violated Daniel's right to equal protection.

## 2. Minnesota Human Rights Act Claim

■ Plaintiff asserts a claim of discrimination under the Minnesota Human Rights Act ("MHRA"). On January 17, 1991, plaintiff filed a charge of discrimination with the Minnesota Department of Human Rights against Independent School District No. 91. The Department conducted an investigation and, on March 5, 1992, found probable cause to believe that the school district had committed an unfair discriminatory practice in violation of Minn.Stat. § 363.03.

The MHRA provides that it is an unfair discriminatory practice for an educational institution "[t]o discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of race ... or national origin...." Minn.Stat. § 363.03, subd. 5(1). Plaintiff claims that defendants knew or should have known that Daniel was being verbally and physically harassed by other students based on his race and national origin. Plaintiff also asserts that by failing to take timely and appropriate action, defendants denied Daniel the full utilization of and benefit from his public education. Viewing the evidence in favor of plaintiff, the court finds that plaintiff has established a prima facie case that defendants violated the MHRA by failing to provide Daniel a learning environment free from racial and national origin discrimination.[5]

5. The MHRA also prohibits educational institution "[t]o exclude, expel, or otherwise discriminate against ... a person enrolled as a student because of race ... or national origin...." Minn.Stat. § 363.03, subd. 5(2). Plaintiff claims that defendants violated the MHRA by excluding Daniel from school in May 1990. This claim must fail as plaintiff concedes, and the court has also concluded, that the exclusion of Daniel from school was not based on his race or national origin.

6. The court admonishes counsel for defendants for violating their ethical obligations by failing to disclose the *Beaulieu* decision. The infraction is particularly egregious because the law firm in-

### A. Immunity Defense

■ Defendants claim that plaintiff's claim under the Minnesota Human Rights Act ("MHRA") should be dismissed on the grounds of official and discretionary immunity. That argument, insofar as it is based on official immunity, cannot survive the decision of the Minnesota Court of Appeals in *State of Minnesota, by Beaulieu v. City of Mounds View*, 498 N.W.2d 503 (Minn.Ct.App.1993), *pet. for rev. granted*, No. C3–92–1780 (Minn. June 9, 1993). In *Beaulieu*, the court held that the common law doctrine of official immunity does not apply to discrimination claims under the MHRA. Because *Beaulieu* is the best evidence of Minnesota law, the court must adhere to that decision.[6]

■ Defendants also assert discretionary function immunity under Minnesota law. The source of discretionary function immunity is Minn.Stat. § 466.03, subd. 6 (1992), which precludes municipal tort liability for claims "based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." "Generally, this immunity protects governmental conduct at the planning or policymaking level, while conduct at the operational level is not protected." *Olson v. Ramsey County*, 509 N.W.2d 368, (Minn.1993) (citing *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 722 (Minn. 1988)). The key inquiry is whether the challenged governmental conduct involves the balancing of public policy objectives that can be made only by the legislative branch of government. *Pletan v. Gaines*, 494 N.W.2d 38, 44 (Minn.1992).[7]

volved in the *Beaulieu* case is the same that represents defendants here.

7. In contrast, official immunity is a common law doctrine which, in the absence of a willful or malicious wrong, protects a public official who is "charged by law with duties which call for the exercise of his judgment or discretion." *Elwood v. County of Rice*, 423 N.W.2d 671, 678 (Minn. 1988) (quotation omitted). Official immunity involves judgment exercised at the operational level rather than the policy-making level, and it requires something more than ministerial duties. *Pletan*, 494 N.W.2d at 40. Duties are ministerial when they are certain and involve "merely the execution of a specific duty arising from fixed and designated facts." *Elwood*, 423 N.W.2d at 677 (quotation omitted).

■ The burden is on defendants to prove that their conduct is immune under Minn.Stat. § 466.03, subd. 6. In analyzing any immunity question it is essential to identify the precise governmental conduct at issue. Plaintiff challenges the failure of defendants to respond appropriately to racial and national origin discrimination of which they were aware. The challenged conduct was not at the planning or policy level where discretionary immunity usually applies. Nor was the challenged conduct of a policy-making nature. Accordingly, the court concludes that defendants are not immune under the discretionary function exception.[8]

### 3. Claim for Punitive Damages

■ Defendants seek to strike plaintiff's claim for punitive damages based on Minnesota Statute § 549.191 which prohibits pleading punitive damages without leave of court. Plaintiff claims that the application of Minn. Stat. § 549.191 in federal courts is limited to diversity cases. Because this action is grounded in federal question jurisdiction, plaintiff contends that Minn.Stat. § 549.191 does not necessarily apply.

In recent years, the federal district court in Minnesota has consistently applied Minn. Stat. § 549.191 in diversity cases.[9] In *Daines v. City of Mankato*, 754 F.Supp. 681, 704 (D.Minn.1990), the court held that the requirements of § 549.191 do not apply to claims for punitive damages asserted under § 363.071 of the MHRA. The court finds the reasoning of that decision persuasive and denies defendants motion to strike plaintiff's claim for punitive damages.

### CONCLUSION

The court concludes that plaintiff has failed to establish a violation of Daniel's due process and equal protection rights guaranteed by the Fourteenth Amendment. Because the court concludes that no constitu-

tional violation occurred, it need not reach the issue of defendants' qualified immunity under section 1983. With respect to plaintiff's claim under the MHRA, the court holds that defendants are not entitled to official or discretionary function immunity. The court also declines to strike plaintiff's claim for punitive damages at this time.

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1. Defendants' motion for summary judgment on plaintiff's § 1983 claim is granted;

2. Defendants' motion for summary judgment on plaintiff's claim under the Minnesota Human Rights Act is denied;

3. Defendants' motion to strike plaintiff's claim for punitive damages is denied.

---

8. Plaintiff contends that discretionary function immunity does not apply to claims under the MHRA. Minnesota courts have not addressed the issue. Because the court concludes that defendants are not entitled to discretionary function immunity, it need not resolve the issue raised by plaintiff.

9. *See, e.g., Security Sav. Bank v. Green Tree Acceptance, Inc.*, 739 F.Supp. 1342, 1352 (D.Minn. 1990); *Zeelan Indus. Inc. v. de Zeeuw*, 706 F.Supp. 702, 703 (D.Minn.1989); *Kuehn v. Shelcore, Inc.*, 686 F.Supp. 233, 234 (D.Minn.1988); *Fournier v. Marigold Foods, Inc.*, 678 F.Supp. 1420, 1422 (D.Minn.1988).