**Michael F. DeROCHE, Plaintiff,**

v.

**ALL AMERICAN BOTTLING CORPORATION, a Delaware Corporation, Defendant.**

**Civ. No. 98–675 (JRT/RLE).**

United States District Court, D. Minnesota.

Nov. 5, 1998.

Mark Leslie Knutson, Lisa Danelle Wilson, Bye Angnew Dryer & Storaasli, Duluth, MN, for plaintiff.

Kathleen Mary Mahoney, David M. Wilk, Oppenheimer Wolff & Donnelly, St. Paul, MN, William Crawford Blanton, Jr., Ranelle Leier, Oppenheimer Wolff & Donnelly, Minneapolis, MN, for defendant.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Motion of the Plaintiff, Michael F. DeRoche ("DeRoche"), to Amend his Complaint so as to assert a claim for punitive damages, and in order to add a claim under the Minnesota Labor Relations Act, Minnesota Statutes Sections 179.12 ("MLRA").

A Hearing on the Motions was conducted on July 28, 1998, at which time DeRoche appeared by Mark L. Knutson, Esq., and the Defendant, All American Bottling Corporation ("All American"), appeared by William C. Blanton, Esq.

For reasons which follow, De Roche's Motion to Amend is denied.

### II. *Factual and Procedural Background*

This is an action arising out of events which followed the sale of Twin Ports 7-Up ("Twin Ports"), a soft drink distributorship located in Duluth, Minnesota, by Pepsico Corporation to All American, in February of 1994. According to DeRoche, as a part of that transfer of ownership, All American considered those employees, who had previously worked at Twin Ports, for continued employment with All American. The hiring process included an interview with each of the existing employees of Twin Ports in order to determine if they would be employed by All American.

DeRoche, who was fifty-six years of age at the time of the sale, had worked for Twin Ports for 24 years. During his employment, DeRoche worked as a sales route driver. As a result of his having submitted a written application for employment, on or about February 18, 1994, DeRoche was interviewed for employment by an agent of All American. It is not clear, given the Record presented to us, who was present at DeRoche's employment interview, but we are informed that the interview lasted approximately fifteen minutes. During the interview, DeRoche was asked about All American's planned use of a "pre-selling" system to distribute its product.

Under the system employed by All American's predecessor, sales were accomplished by the route drivers loading onto their trucks the amount of product that they expected would satisfy the needs of the customers on their route. Upon arriving at the customer's retail outlet, the driver would negotiate, with the customer, the actual amount of product that would be sold. According to DeRoche, All American was proposing to use a system in which its product would be pre-sold to its customers. Under this approach, the customer would be contacted, by telephone, prior to the delivery date, and an order would then be taken for a specific quantity of All American's product, and the route drivers would then load the ordered product onto their trucks for delivery. Once at the customer's place of business, the driver would restock, and would arrange, the product for resale.

DeRoche contends that he was receptive to the pre-selling plan, and that he expressed that view during his interview. As related by DeRoche, he had worked under a variety of sales systems during his tenure at Twin Ports, and he was not averse to the approach being proposed by All American. DeRoche also asserts that, at all times during his employment with Twin Ports, he had an excellent relationship with the customers he serviced, and

that he had been relied upon to train new employees.

When All American announced who would be a part of its newly established workforce, DeRoche was not included. According to DeRoche, All American did hire some previous Twin Ports employees, but none of those hired were older than forty years of age, and none of the sales route drivers, who were then hired, were older than the age of thirty. Thereafter, DeRoche filed a claim of age discrimination with the Minnesota Department of Human Rights.

Following the announcement of All American's new hires, DeRoche asked All American to explain the reasons for its rejection of his employment application. In response, DeRoche was told that he was refused employment because All American had concluded that he was resistant to change, and could not adapt to All American's new "system." DeRoche takes strong exception to that explanation, as he recalls that, during his employment interview, he expressed a positive, and supportive, attitude toward the proposed pre-sale distribution plan which, by DeRoche's reckoning, was the only substantive marketing change that was being proposed by All American. Assuming, as he does, that the interview was the only basis upon which All American relied for its decision not to hire him, DeRoche contends that the reasons given for his rejection were merely a pretext for All American's true, discriminatory intent to deny him employment because of his age, and his union affiliation.

In support of his claim of discrimination, DeRoche offers an account of a conversation that he had with Steve Steele

("Steele"), who had been employed at Twin Ports for approximately eighteen months prior to its acquisition by All American. He was then hired by All American as a sales route driver. DeRoche notes that Steele was "about 30" at the time he was hired by All American, and he recounts that, during their conversation, Steele told him that a manager employed by All American advised that the true reason for DeRoche's employment rejection was different than what All American had explained. Steele allegedly stated that the unidentified manager explained that DeRoche was not hired because of his age, and his status as a union member.

DeRoche commenced this action, in Minnesota District Court, in January of 1998. In his Complaint, DeRoche alleges that the Defendant illegally denied him employment because of his age, in violation of Minnesota Statutes Sections 363.01 *et seq.*, and 181.81, and he claims damages in excess of fifty thousand dollars. Relying upon the parties' diversity of citizenship as a jurisdictional predicate,[1] on February 11, 1998, All American timely removed the action to this Court. See, 28 U.S.C. § 1441. In his current Motion, DeRoche requests leave to amend his Complaint so as to include a claim for punitive damages, under Minnesota Statutes Section 181.81, and to incorporate a claim under the MLRA. Notably, no Federal questions are presented in the claims that DeRoche has pleaded, or that he has requested leave to plead. Against this backdrop, we consider the DeRoche's Motion to Amend his Complaint.

### III. *Discussion*

■ A. *Standard of Review.* Where, as here, a plaintiff seeks to amend his

---

1. DeRoche's Complaint claims damages in excess of $50,000 while, in removing the action, All American represented as follows:

 The damages Plaintiff claims to sustain include the lost wages, lost fringe benefits, lost job opportunities, emotional anguish and loss of personal and professional reputation. Plaintiff also seeks attorney's fees, costs and disbursements incurred in this action. * * * Plaintiff's Complaint claims

 he earned at least $23,666 per year, not including benefits. It is clear that if Plaintiff succeeds on his claims and is awarded past and future earnings, the $75,000 jurisdictional threshold of this Court will be exceeded.

 DeRoche does not challenge removal, and we are unable to say, on the Record before us, that removal was improper or improvident.

Complaint, Rule 15(a), Federal Rules of Civil Procedure, dictates that leave to amend shall be "freely given when justice so requires." The Supreme Court has explained the purposes of Rule 15(a) as follows:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of such an apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); see also, *ARE Sikeston v. Weslock National, Inc.*, 120 F.3d 820, 832 (8th Cir.1997); *Thompson–El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989).

Although we begin with a presumption of liberality, an amendment to a pleading can be successfully challenged on grounds of futility if the claims created by the amendment would not withstand a Motion to Dismiss for failure to state a claim upon which relief can be granted. See, *Humphreys v. Roche Biomedical Laboratories, Inc.*, 990 F.2d 1078, 1082 (8th Cir.1993); *Weimer v. Amen*, 870 F.2d 1400, 1407 (8th Cir.1989); *Holloway v. Dobbs*, 715 F.2d 390, 392–93 (8th Cir.1983); *Norbeck v. Davenport Community Sch. Dist.*, 545 F.2d 63 (8th Cir.1976), cert. denied, 431 U.S. 917, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977); but cf., *Karl's Inc. v. Sunrise Computers, Inc.*, 901 F.2d 657, 660 (8th Cir. 1990) ("colorable showing" sufficient to withstand application of clearly frivolous rule).

B. *Legal Analysis.* As noted, DeRoche seeks leave to amend his Complaint in order to assert a claim for punitive damages, and to invoke any remedies under the MLRA. Since the proposed amendments involve different considerations, we address them separately.

> 1. *DeRoche's Motion to Amend his Complaint to Include Punitive Damages Under Minnesota Statutes Section 181.81.*

As a threshold issue, we are obligated to determine whether Minnesota Statutes Section 181.81 permits a recovery for the punitive damages. If the Statute does not, then we need not consider whether DeRoche has satisfied his burden, under the laws of Minnesota, to present *prima facie* evidence that the Defendant acted with a deliberate disregard to his entitlement, if any there be, to employment with All American. See, Minnesota Statutes Sections 549.191 *and* 549.20.

All American argues that Minnesota Statutes Section 181.81 does not envision an award of punitive damages, because the provisions of that Statute specifically enumerate the remedies that the Minnesota Legislature intended.[2] As a result, All American argues that any claim, by DeRoche, for punitive damages under Section 181.81, would not withstand a Motion to Dismiss because "[o]n its face, the statute does not allow [the] Plaintiff to recover punitive damages." See, *Defendant's Memorandum in Opposition to Plaintiff's Motion to Amend* at 2. Given the plain language of Section 181.81, and the pertinent case law, we agree.

 Section 181.81 allows a person, who has been refused employment, or who is terminated, or demoted, on account of his or her age, to commence an action to

---

**2.** Minnesota Statutes Section 181.81, in pertinent part, states as follows:

> If a violation is found the court in granting relief may enjoin further violations and may include in its award reinstatement or com-

pensation for any period of unemployment resulting from the violation together with actual and reasonable attorneys fees, and other costs incurred by the plaintiff.

remedy the purportedly discriminatory conduct. See, Minnesota Statutes Section 181.81, Subdivisions 1(a), 2(b); *Lecy v. Sage Co.*, 460 N.W.2d 102, 105 (Minn.App. 1990). The remedies, that are available under Section 181.81, are clear and unequivocal, since the Act provides only the two following forms of relief:

> If a violation is found the court in granting relief may enjoin further violations and may include in its award reinstatement or compensation for any period of unemployment resulting from the violation together with actual and reasonable attorneys fees, and other cost incurred by the plaintiff.

Minnesota Statute Section 181.81, Subdivision 2(b).

In contrast, however, DeRoche argues that the Statute, despite its express enumeration of specific remedies, should be read to permit an award of punitive damages, so long as a plaintiff satisfies the preconditions of Minnesota Statutes Sections 549.191,[3] and 549.20, which detail the basis upon which a Court may allow a claim for punitive damages to proceed. In addition, DeRoche argues that a specific recitation, of an entitlement to seek punitive damages, is not a prerequisite to the Court's grant of such leave. According to DeRoche, the Minnesota Legislature envisioned the inclusion of punitive damage claims even though the Legislature failed to express that intent in the terms of Section 181.81 itself. He premises this argument on the language of Section 549.20 which flatly states that "[p]unitive damages *shall* be allowed in a civil action." Minnesota Statute Section 549.20, Subdivision 1 (emphasis added). In response, All America underscores that Section 549.20 does not authorize an award of punitive damages for any given claim, but requires, instead, that the cause of action itself, whether statutory or at common law, empower the Court to impose punitive relief, and Section 181.81 contains no such empowerment.

■ DeRoche cites the Minnesota Supreme Court's decision in *Wirig v. Kinney Shoe*, 461 N.W.2d 374 (Minn.1990), which allowed for damages under both Sections 181.81 and 363, as supportive of his entitlement to seek punitive relief. We are not so persuaded. Although *Wirig* does allow parallel claims for damages to proceed under both statutes, the damages awarded, in *Wirig*, as to the Section 181.91 claim, were solely compensatory in nature. Punitive damages were only allowed on the plaintiff's claims under Section 363. Indeed, none of the cases offered by DeRoche, in support of paralleling punitive damages under Sections 181.81 and 363, sustain that contention.[4] Quite simply, it is not suffi-

---

**3.** In pertinent part, Section 549.191 provides as follows:

> After filing the suit a party may make a motion to amend the pleadings to claim punitive damages. The motion must allege the applicable legal basis under section 549.20 or other law for awarding punitive damages in the action and must be accompanied by one or more affidavits showing a factual basis for the claim. At the hearing on the motion, if the court finds *prima facie* evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages.

**4.** The Plaintiff proffers *Rosenbloom v. Flygare*, 501 N.W.2d 597 (Minn.1993), for the proposition that paralleling claims, including claims for punitive damages, are permissible under Section 363. *Rosenbloom*, however, merely states that a claim for punitive damages, un-

der Section 363, may be pursued in conjunction with a claim for compensatory damages under Section 181.81. As such, *Rosenbloom* does not speak to the question before this Court, and its holding is unavailing to DeRoche's claimed entitlement to plead for punitive relief. Likewise, DeRoche's reliance on *Vaughn v. Northwest Airlines, Inc.*, 558 N.W.2d 736 (Minn.1997), and *Bruss v. Toro Co.*, 427 N.W.2d 17 (Minn.App.1988), is misplaced. In both cases, the Court did no more than allow claims, which arose out of the same set of operative facts as supported a Section 181.81 action, to undergird a Section 363 action. Again, these decisions lend no light to the question before us, and All American concedes, as it must, that paralleling claims, under Sections 181.81 and 363, are permissible. These cases do not so much as intimate, however, that punitive damages, under Section 181.81, are allowable.

cient to argue, as DeRoche does here, that claims under Sections 181.81 and 363 are "independent," and not "dependent" on each other. See, *Lecy v. Sage Co.*, supra at 105. What is at issue here is whether the independent Section 181.81 action may successfully shoulder a punitive damage claim. As the Court reasoned, in *Lecy:*

> We also note that the two statutes are administered by different agencies and provide substantially different relief. The remedies provided by section 181.81, back pay or reinstatement, are considerably less than those provided by chapter 363, which include punitive damages, treble damages, civil damages, and compensation for emotional distress. There is, therefore, a significant disadvantage to failing to meet the procedural requirements in chapter 363. By bringing a claim under section 181.81, a person does not circumvent the procedural requirements in chapter 363.

*Lecy v. Sage Co.*, supra at 105 (citations omitted); see, Minnesota Statutes Sections 181.81, Subdivision 2(b), and 363, et seq...

We find this analysis persuasive. The interrelationship of Chapters 363 and 181.81 make sense only in the context of the Minnesota Legislature's attempt to create two separate and distinct avenues of relief for one aggrieved of age discrimination. One avenue, Section 363, has significant procedural requirements, and provides additional forms of relief, including punitive damages. The other, Section 181.81, has fewer procedural limits on a recovery and,

correspondingly, provides a more limited spectrum of relief.

■ Given this perspective of legislative purpose, we find implausible DeRoche's contention, that Minnesota Statutes Section 181.81, in conjunction with Section 549.20, allows for a punitive recovery. As recognized in *Lecy*, if the full measure of damages, which are permitted under Section 363, were also available under Section 181.81, then a complaining party would be easily able to sidestep the Legislature's insistence that punitive damages, along with the other remedial relief, which is available under Section 363, only be accessible if the procedural requirements of Section 363 are first satisfied. Here, DeRoche proposes to seek punitive damages under Section 363, and we see no legitimacy to his claim that he is entitled to the same punitive relief under Section 181.81.

■ Our conclusion is bolstered by the well recognized rule of construction which requires two statutes, which relate to the same subject matter, to be read so as to harmonize their respective provisions. See, *People for Environmental Enlightenment and Responsibility, Inc. v. Minnesota Environmental Quality Council*, 266 N.W.2d 858, 866 (Minn.1978), citing *Lenz v. Coon Creek Watershed District*, 278 Minn. 1, 153 N.W.2d 209, 217 (1967); *State ex rel. Carlton v. Weed*, 208 Minn. 342, 294 N.W. 370, 371 (1940). Of course, "[w]e also presume that, in enacting a statute, the Legislature acted with full

Finally, the Plaintiff contends that the decision in *Bucko v. First Minnesota Sav. Bank*, 471 N.W.2d 95 (Minn.1991), supports his assertion that punitive damages, pursuant to Minnesota Statutes Section 549.20, can be awarded for a violation of statutes which do not specifically authorize punitive relief, so long as the *prima facie* showings, as required by Section 549.20, are satisfied. *Bucko*, however, is readily distinguishable, for Minnesota Statutes Section 181.75, Subdivision 4—unlike Section 181.81, which limits any recovery to compensation and reinstatement—provides for recovery of "any and all damages recoverable at law." Minnesota Statutes Section 181.75, Subdivision 4. In addition, as we note in the text of this Order, Sections 181.81 and

363 are closely related in their statutory purpose—namely, to provide a uniform approach to address incidents of age discrimination—the allowance of punitive damages, under Section 181.75, Subdivision 4, which relates to the employment of polygraphs, does not argue in favor of the same relief in a non-polygraph case. Had the Minnesota Legislature intended to allow "any and all damages recoverable at law," in a Section 181.81 case, they certainly had the opportunity of expressing that intent in the provisions of that Section. The Legislature did not so specify, and we should not presume to legislate such matters which are well outside of our judicial role.

knowledge of prior legislation on the same subject." *Erickson v. Sunset Memorial Park Assn.*, 259 Minn. 532, 108 N.W.2d 434, 441 (1961); *Minneapolis Eastern Railway Co. v. City of Minneapolis*, 247 Minn. 413, 77 N.W.2d 425, 428 (1956). Here, unmistakably, the Minnesota Legislature intended that Sections 181.81 and 363 operate in harmony with each other, and to allow Section 181.81 to subsume the remedies of Section 363, without compliance with procedural requirements of Section 363, would render Section 363 a nullity. As but one example, punitive damages under Section 363 are limited to $8,500 but, accepting DeRoche's argument, that punitive damages are available under Section 181.81, we would, nonetheless, find no similar limitation on a punitive recovery—thereby inducing, by judicial fiat, claimants to seek a recovery under Section 181.81, inclusive of exemplary damages, by a cause of action which would be unencumbered by the procedural requisites of Section 363. See, Minnesota Statutes Section 363.071, Subdivision 2. If there is merit to such a drastic reformulation of Section 181.81, we are confident that the virtues of such legislative reform will not escape the Minnesota Legislature.

In sum, we conclude that punitive damages may not be sought under Section 181.81, and DeRoche's attempt to plead such a claim is futile. As a result, his Motion to Amend is denied in this respect.[5]

2. *DeRoche's Motion to Amend his Complaint to Incorporate a Claim under the MLRA.*

While DeRoche seeks to amend his Complaint in order to include a claimed violation of the MLRA, see, Minnesota Statutes Section 179.12, he does not request the relief that is expressly afforded by that Statute—namely, an Injunction or a Restraining Order. Instead, he seeks compensatory damages under Minnesota Statutes Section 8.31, Subdivision 3a, which permits private civil actions to recover damages arising from violations of those laws which are identified in Subdivision 1 of that Section.[6] See, Minnesota Statutes Sections 179.14, and 8.31, Subdivisions 1, 3a. Since the listing in Subdivision 1 does not purport to be exclusive, DeRoche argues that an MLRA claim

---

**5.** in his original Complaint, DeRoche alleged a claim for punitive damages under Section 363. As we have recently reiterated:

[W]e have held, consistent with precedent within this District, that a specific punitive damage provision in the Minnesota Human Rights Act ("MHRA"), displaces the requirements of Minnesota Statutes Section 549.191.

*Backlund v. City of Duluth*, 176 F.R.D. 316, 322 (D.Minn.1997), citing *Ulrich v. City of Crosby*, 848 F.Supp. 861, 876 (D.Minn.1994); *Daines v. City of Mankato*, 754 F.Supp. 681, 704 (D.Minn.1990); *Engele v. Independent School District No. 91*, 846 F.Supp. 760, 768 (D.Minn.1994).

As a consequence of our ruling, that punitive damages are unavailable under Section 181.81, we have no occasion to consider whether DeRoche's showings suffice to present a *prima facie* entitlement to plead exemplary damages. Further, since Section 363 displaces such a *prima facie* showing under Section 549.191, we need not, and do not reach the sufficiency of DeRoche's *prima facie* entitlement or plead a punitive damage claim.

**6.** Minnesota Statutes Section 8.31, Subdivision 1, lists the following claims as permitting the commencement of a private cause of action for damages:

The attorney general shall investigate violations of the laws of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade, and specifically, but not exclusively, the non-profit corporation act (sections 317A.001 to 317A.909), the act against unfair discrimination and competition (sections 325D.01 to 325D.07), the unlawful trade practices act (sections 325D.09 to 325D.16), the antitrust act (sections 325D.49 to 325D.66), section 325F.67 and other laws against false or fraudulent advertising, the antidiscrimination acts contained in section 325D.67, the act against monopolization of food products (section 325D.68), the act regulating telephone advertising services (section 325E.39), the prevention of consumer fraud act (sections 325F.69 to 325F.70), and chapter 53A regulating currency exchanges and assist in the enforcement of those laws as in this section provided.

should also allow the pursuit of compensatory damages, rather than being limited to equitable relief.

 In response, All American points to the limitation of private actions under Section 8.31, Subdivision 3a, and particularly emphasizes that the MLRA is not among those claims referenced in Subdivision 1. The issue presented—namely, whether an MLRA claim should be allowed to bear a demand for compensatory damages—is an intriguing one, but is not a question we are now required to reach. All American urges, we think correctly, that any purported claim for compensatory damages, under the MLRA, would be preempted by the National Labor Relation Act ("MLRA"). See, Title 29 U.S.C. § 158(a)(3).[7] Beginning in 1935, the Federal government enacted a series of laws which regulated labor-management disputes, and which assured workers, and their employers, of certain rights. Since that time, the Supreme Court has formulated the following test for determining whether these Federal laws preempt a State law that is potentially applicable to labor disputes:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by S[ection] 7 of the National Labor Relations Act, or constitute an unfair labor practice under S[ection] 8, due regard for the federal enactment requires that state jurisdiction must yield.

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

The NLRA, however, contains no express preemption provision. See, *Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993); *United Steelworkers of America, AFL—CIO—CLC v. St. Gabriel's Hosp.* 871 F.Supp. 335, 339 (D.Minn.1994); 29 U.S.C. § 158. Therefore, in accordance with settled principles, preemption will not be found "unless [the State law] conflicts with federal law or would frustrate the federal scheme, or unless [the Court] discern[s] from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747–748, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). Understandably, Courts are reluctant to infer preemption, see *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), for, "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981); *Boyle v. Anderson*, 68 F.3d 1093, 1098 (8th Cir.1995); *Parten v. Consolidated Freightways Corp. of Delaware*, 923 F.2d 580, 582 (8th Cir.1991).

 Notwithstanding the hesitation to find preemption, the Supreme Court has, nonetheless, identified "two distinct NLRA preemption principles." *Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.*, supra at 224, 113 S.Ct. 1190; *Metropolitan Life Ins. Co. v. Massachusetts*, supra at 747, 105 S.Ct. 2380. The first—and the one applicable here—is referred to as the *Garmon* preemption, which forbids the State and local

---

**7.** In relevant part, Title 29 U.S.C. § 158 provides as follows:

 (a) Unfair labor practices by employer
 It shall be an unfair labor practice for an employer—
 \* \* \* \* \* \*
 (3) by discrimination in regard to hire or tenure of employment \*\*\* to encourage or discourage membership in any labor organization.

regulation of activities that are "protected by Section 7 of the [NLRA], or constitute an unfair labor practice under Section 8." [8] See, *San Diego Building Trades Council v. Garmon*, supra at 244, 79 S.Ct. 773; *BE&K Construction Co. v. United Brotherhood of Carpenters and Joiners of America, AFL—CIO*, 90 F.3d 1318, 1327 (8th Cir.1996); 29 U.S.C. §§ 157, 158(a)(1), (3); see also, *Garner v. Teamsters*, 346 U.S. 485, 498–499, 74 S.Ct. 161, 98 L.Ed. 228 (1953) ("[W]hen two separate remedies are brought to bear on the same activity, a conflict is imminent"). The *Garmon* preemption even prohibits the regulation of activities that the NLRA only arguably protects, or prohibits. See, *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986); *Employers Assoc., Inc. v. United Steelworkers of America, AFL—CIO—CLC*, 32 F.3d 1297, 1300–01 (8th Cir.1994); *Brennan v. Chestnut*, 973 F.2d 644, 646 (8th Cir.1992). In effect, this rule of preemption is designed to prevent a conflict between State and local regulation, on the one hand, and Congress' "integrated scheme of regulation," on the other, *Employers Assoc., Inc. v. United Steelworkers AFL—CIO—CLC*, supra at 1300, which is embodies in Sections 7 and 8 of the NLRA, and which includes the choice of the NLRB, rather than State or Federal Courts, as the appropriate body to implement the Act. See, *Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.*, supra at 224, 113 S.Ct. 1190, citing *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748–49, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *United Paperworkers Int'l. Union, AFL—CIO, Local 274 v. Champion Int'l. Corp.*, 81 F.3d 798, 802 (8th Cir.1996).

In *Garmon*, the Supreme Court held that a State Court was precluded from awarding damages to employers for economic injuries, which had resulted from peaceful picketing by labor unions that had not been selected by a majority of the employees as their bargaining agent. See, *San Diego Building Trades Council v. Garmon*, supra at 246, 79 S.Ct. 773; *White Motor Corp. v. Malone*, 412 F.Supp. 372, 378 (D.Minn.1976), rev'd. on other grounds, 545 F.2d 599 (8th Cir.1976). In so holding, the *Garmon* Court explained: "Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered." *Id.* Later, in *Gould*, the Supreme Court concluded that the NLRA preempts a statute which disqualifies entities from doing business with the State when those entities had violated the NLRA three times within a 5–year period. See, *Wisconsin Department of Industry, Labor and Human Relations v. Gould Inc.*, supra at 291, 106 S.Ct. 1057. As the Court explained, "the *Garmon* rule prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Id.* at 286, 106 S.Ct. 1057, citing *San Diego Building Trades Council v. Garmon*, supra at 247, 79 S.Ct. 773.

 Given the Record before us, we conclude that, if DeRoche were allowed to

---

**8.** A second preemption principle—the *Machinists* preemption—prohibits the State and municipal regulation of areas that have been left "to be controlled by the free play of economic forces.'" *Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993), quoting Lodge 76, Intern. Ass'n of *Machinists v. Wisconsin Employment Relations Comm'n.*, 427 U.S. 132, 140, 147, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976); see also, *Golden State Transit Corp. v. City of Los Angeles ("Golden State I")*, 475 U.S. 608, 614, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986); *Golden State Transit Corp. v. Los Angeles ("Golden State II")*, 493 U.S. 103, 111, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) *Machinists* preemption preserves Congress' "intentional balance between the uncontrolled power of management and labor to further their respective interests." *Golden State I*, supra at 614, 106 S.Ct. 1395 (citations omitted).

bring a claim for compensatory damages under the MLRA, then his action would impermissibly contravene the purposes of the *Garmon* preemption. Here, All American's assertedly discriminatory denial of employment to DeRoche is, arguably, encompassed within Section 7, or is prohibited by Section 8, of the NLRA, and, as an unavoidable result, the *Garmon* presumption of preemption attaches. See, *Caldwell v. American Basketball Association, Inc.*, 66 F.3d 523, 526–27 (2nd Cir.1995) (finding that a failure to hire, which is based upon a potential employee's previous union affiliation, was arguably within the purview of the NLRA and, therefore, was preempted), cert. denied, 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996); *Rew v. International Organization, Masters, Mates and Pilots of America, Inc.*, 349 F.Supp. 542, 545 (E.D.Pa.1972) (preempting State law claim for damages, which arose out of a union's interference, under the NLRA, with an employer's hiring of an employee); cf., *R.M. Perlman Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89–22–1, I.L.G.W.U.*, 789 F.Supp. 127 (S.D.N.Y.1992) (holding that, while a State law claim for harm, which arises out of a union's picketing of a business, was within the scope of the NLRA, preemption was not applicable because the claim was not pled to include compensatory damages).

Of course, like most everything else, *Garmon* preemption is not without exception. As our Court of Appeals recently explained:

Garmon's broad preemption rule is subject to an exception when the arguably protected or prohibited activities "touch interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act."

*Garmon*, 359 U.S. at 243–44, 79 S.Ct. at 778–79. Under this exception, the Supreme Court has declined to preempt a variety of state law claims even though they arose in a labor law context. See, e.g., *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) (trespass by peaceful picketing); *Farmer v. United Bhd. of Carpenters and Joiners*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) (intentional infliction of emotional distress); *Linn v. United Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (defamation).

\* \* \* \* \* \*

If the challenged conduct occurs in the context of a labor dispute, so that an unfair labor practice charge could have been filed, but the deeply rooted local interest in regulating that conduct is strong, the critical inquiry for Garmon preemption purposes is "whether the controversy presented to the state court is identical to ... that which could have been, but was not, presented to the Labor Board." *Sears, Roebuck*, 436 U.S. at 197, 98 S.Ct. at 1757.

*Platt v. Jack Cooper Transport, Co., Inc.*, 959 F.2d 91, 94–95 (8th Cir.1992).

In *Platt*, the plaintiff was discharged from employment for reasons assertedly related to his reporting of safety complaints in the workplace. While recognizing that local governments have a deeply seated interest in protecting job-safety complainants from adverse employment actions, our Court of Appeals concluded that plaintiff "could have brought to the NLRB the specific claim asserted in [his] lawsuit—that he was fired for making job safety complaints" and, therefore, the Court would be simply functioning as "an alternative forum for obtaining relief that the Board can provide." *Id.* In view of the Record before us,[9] and the nature of De-

9. For these purposes, we assume, *arguendo*, that a "deeply rooted local interest"—apart from the deference to be extended to union membership, under both Federal and State law—has been shown to exist. While we find no such showing, either in DeRoche's Complaint, or in his arguments to this Court, our analysis of any exception to *Garmon* preemp-

Roche's requested relief, the circumstances presented by *Platt* are "precisely the situation here," and we find that the "deeply rooted local interest" exception to the *Garmon* doctrine has no application here. *Id.*

Accordingly, DeRoche's Motion to Amend his Complaint, so as to plead a claim for damages under MRLA, must be denied. The conduct he alleges is "arguably" an unfair labor practice, and is subject to the exclusive jurisdiction of the National Labor Relations Board ("NLRB"). Were DeRoche's MRLA claim allowed to proceed, we would be required to find the operative facts, determine whether the applicable State law was consistent with the substantive provisions of the NLRA, and fashion a remedy to redress any proven violation. However, each of these same functions is within the exclusive province of the NLRB. See, *Caldwell v. The American Basketball Association, Inc.,* supra at 527. As a consequence, were we to find that a private suit for compensatory damages was countenanced by Minnesota Statutes Section 8.31, for a violations of the MRLA—a decision we do not here reach—such a claim would be barred under the NLRA, as construed in *Garmon,* and would, therefore, be futile. For these reasons, we recommend that this portion of DeRoche's Motion to Amend also be denied.

NOW, THEREFORE, It is—

ORDERED:

That the Plaintiff's Motion to Amend his Complaint to Include a Claim for Punitive Damages, and to Add a Claim Under Minnesota Statutes Section 179.12 [Docket No. 6] is denied.

tion presumes the existence of such a local interest.